NEWTON, et al. vs. GRIFFITH, et al.—June, 1827.

Before the act of 1786, ch. 45, (to direct descents,) a devise of land by A. to his son J, and his heirs, and other land to his son G, and his heirs; and in case either of them *"should decease, having no lawful issue or heirs of his body,"* then the surviving son *"to have his deceased brother's part of the land,"* to him and his heirs; and in case both sons *"should decease, leaving no lawful heirs of their bodies,"* then all the aforesaid lands unto the testator's three daughters, S, S, & N, to be equally divided between them, would have vested in J and G each, estates tail general, in the lands respectively devised to them, with cross remainders in tail general, remainder to S, S, & N for life. But by operation of that act, the devise being made in 1792, J and G took virtually estates in fee in the lands devised to them respectively; and on the death of G, without issue and intestate, J, and S, S, and N, surviving him, J took by descent from him, one-fourth of his estate; and J also dying without issue and intestate, that, with the whole of the estate devised to him by his father, descended to his three sisters S, S, and N, as his heirs at law.

On a bill filed against S, S, and N, as heirs at law of J—*Held*, that the land which thus descended from J, was subject to be sold for the payment of his debts.

The words "without issue" in a will, when applied to dispositions of real estate, *ex vi termini*, mean an indefinite failure of issue, if there be nothing in the will restricting it to a failure at the time of the death of the first devisee, or to some other time or event.

To have no issue—to die having no issue, and to die without issue, are technically and judicially convertible terms.

The word *leaving*, as well as the words *having* and *without*, in devises—"and if he shall die without *leaving* any issue"—"without *having* issue," or *"without issue,"* has acquired a technical judicial decision, and when applied to real estate, means an indefinite failure of issue.

In dispositions of personal property, the courts generally incline to the construing a limitation after a dying without issue, to mean a dying without issue at the death of the first legatee, in order to support, if they can, the limitation over; yet in relation to real estate, the construction is generally otherwise.

The circumstance of a limitation over, being to a survivor, and his heirs, or only of a life estate to a person *in esse*, has not the effect, in dispositions of real estate, in either case, to restrict the established legal meaning of the words, "leaving no lawful heirs of their bodies," to a failure at the death of the first taker, or survivor.

If there be a devise to one generally of freehold and personal estates, with

out any words of limitation, he will take an estate for life only, in the freehold, but the personal property absolutely.

By the act of 1782, *ch.* 23, the ancient mode of docking estates tail, by common recovery, is abolished; and any person seized of any estate tail, in possession, remainder or reversion, may convey the same in the same manner and form that a tenant in fee may.

Before the passage of the act of 1786, *ch.* 45, estates tail were not liable for debts contracted by tenants in tail; but by that act estates tail general, created since its passage, were virtually abolished, and converted into estates in fee simple, and have now all the incidents of lands held in fee; they are descendible, transferrable and devisable, and subject to be sold for the payment of debts, as estates in fee.

Estates tail general, divided among heirs, taken by election or sold by commissioners, are held in fee simple.

By the act of 1786, *ch.* 45, lands held in fee simple and fee tail general, created since its commencement, descend first to the child or children, and their descendants, if any, equally; and if no children or descendants, to collaterals indefinitely.

The legislature having a right to prohibit the creation of estates tail, must have a right to direct in what manner, lands so held by subsequent creation, should descend.

A dying intestate, means a dying without making a valid and operative disposition by will.

Estates tail general, created before the act of 1786, and estates tail special, are excepted from the operation of that act.

APPEAL from *Dorchester* County Court, sitting as a *court of equity.*

The facts in this cause are fully set forth in the opinion of this court, delivered by the chief judge. It was argued at June term 1825, before BUCHANAN, Ch. J. and EARLE, STEPHEN, and ARCHER, J. by

*J. Bayly*, for the Appellants, and by
*Bullitt* and *Kerr*, for the Appellees.

*Curia adv. vult.*

BUCHANAN, Ch. J. at this term, delivered the opinion of the court. The controversy in this case, turns upon the construction of the will of *Joseph Griffith*, the elder, dated the 6th of February 1792, and of the act of 1786, *ch* 45, *s.* 1, the act to direct descents.

The language of the will, (so far as concerns this case,) is, "I give and devise unto mv son *Joseph Griffith*, my present dwelling plantation whereon I now live, to him, my said son *Joseph*, his heirs and assigns forever. *Item.* I give and de-

vise unto my son *George Griffith*, the plantation whereon *Levi Oram* now lives, lying on *Transquakin* river, or a branch thereof, to him, my said son *George*, his heirs and assigns forever: and my will is, that all the land which I am now possessed of, either by deed, bond or patent, be equally divided between my said two sons *Joseph* and *George*, according to quantity and quality, share and share alike, to them, their heirs and assigns forever; and in case either of my said sons should decease, *having no lawful issue or heirs of his body*, that then the surviving son to have his deceased brother's part or moiety of the land aforesaid, to him, his heirs and assigns forever, as aforesaid; and in case both my said sons *Joseph* and *George* should decease, *leaving no lawful heirs of their bodies*, that then and in such case, I give and devise all my aforesaid lands, devised as aforesaid, unto my three daughters, *Sophia*, *Sarah*, and *Nancy Griffith*, to be equally divided between my aforesaid three daughters." *George Griffith*, one of the sons and devisees, died intestate and without issue in May 1814 after the death of the testator, who died seized of the devised premises; and *Joseph Griffith*, the other son and devisee, died also intestate and without issue, in November 1814, without leaving personal property sufficient for the payment of his debts. His three sisters, *Sophia*, *Sarah* and *Nancy*, who survived him, and are still living, are his only heirs at law. The bill in this case was filed against them as such, (and their husbands,) and seeks to subject to sale, for the payment of his debts, all the real estate of which he died seized. The defendants in their answer, admit that he died seized in fee of certain lands derived to him by inheritance from his mother, which descended to them, his sisters, as his heirs at law, subject to his debts; but they claim to hold, under the will of *Joseph Griffith* the elder, all the land devised to *Joseph Griffith*, the younger, and his brother *George*, by virtue of the limitation over to them, *Sophia*, *Sarah* and *Nancy*, on the contingency of both their brothers, *Joseph* and *George*, dying without "leaving lawful heirs of their bodies;" and deny that any part of the lands so devised, descended to them from *Joseph Griffith* the younger, as his heirs at law, and insist that

they are not liable for his debts; and a decree *pro forma* passed accordingly.

The case is brought before this court on an appeal from that decree; and the question to be decided is, what estates in the lands devised, passed to *Joseph Griffith,* the younger, and *George Griffith,* respectively, under the will of their father, whether "estates tail general," or "estates in fee simple," with cross limitations over by way of executory devise, as the law stood before the passage of the act to direct descents?

When this case was argued, it was understood that a cause was then depending in this court on the *western shore,* in which the same question was virtually involved; it was therefore thought expedient to hold this case under advisement until that should also be heard. That cause has since been decided. It was the case of *Dallam vs. Dallam,* 7 *Harris & Johnson,* 220, and depended upon the construction of a devise in the will of *Frances Middlemore* made in August 1755, which is in these words: "I give and devise unto the aforesaid *Richard Dallam* and *Josias Dallam,* and to their heirs and assigns forever, as tenants in common, equally to be divided between them, all that tract of land called *Palmer's Forest,* lying on the west side of *Swan Creek;* but if either of them dies before the age of twenty-one years, and without issue, then I will that one equal half part of the said land be held and enjoyed by *Goldsmith Garrettson,* (son of *George* and *Martha Garrettson,*) his heirs and assigns forever, to whom I give and devise the same accordingly. And in case the said *Richard Dallam* and *Josias Dallam* should both die before the age of twenty-one years as aforesaid, and without issue, then I give and devise the whole of *Palmer's Forest* to the aforesaid *Goldsmith Garrettson,* his heirs and assigns forever." It was there contended, that the words "without issue" meant an indefinite failure of issue; that is, a failure of issue whenever it might occur, which was a contingency too remote to sustain a limitation over by way of executory devise; and that, therefore the devisees, *Richard* and *Josias Dallam* respectively, took estates tail. But it was held, on full consideration and an examination of all the principal authorities relating to the subject, that *Richard* and *Josias Dallam* each took

an estate in fee, in the premises respectively devised to them, defeasible by the event of his dying before he attained the age of twenty-one years and without issue; not on the ground that the words "without issue" alone mean a failure of issue at the time of the death of the devisee, or that a limitation over of real estate, on an indefinite failure of issue, is good by way of executory devise; on the contrary the court there explicitly lay down, as settled and established rules not now to be questioned, 1st. That no limitation can be good as an executory devise, unless it be on a contingency that must happen, if at all, within a life or lives in being, and twenty-one years and a fraction of a year afterwards, allowing for the time of gestation; and that if it be on an event, which may or may not happen within the prescribed limits, it is void from the beginning, no matter how the fact turns out afterwards. 2dly. That wherever there is a devise of real estate to one and his heirs, with a limitation over, if he should die without issue, the general words "without issue" mean an indefinite failure of issue; that is, not a failure of issue at the time of the death of the devisee, but a failure whenever they shall become extinct, without reference to any particular time or event, if there be nothing in the will clearly showing a different intention on the part of the testator, and restricting the failure to the time of the devisee's death, or to some other time or event; and that in every such case the contingency is too remote to support an executory devise, as it may not happen within the time prescribed; but the first devisee takes an estate tail, and the limitation over operates as a contingent remainder, expectant upon the precedent particular estate tail. But 3dly. That wherever there are expressions in the will clearly restricting the "dying without issue," to a failure of issue, at the time of the death of the first taker, or to some other time or event which must occur, if at all, within the time allowed for the happening of a contingency, on which an executory devise may be limited, there the first devisee takes an estate in fee simple, and the limitation over is void as a contingent remainder, but good by way of executory devise. And on the peculiar structure of the devise in the will of *Frances Middlemore,* on which the question in that case arose, the dying "without issue" was held to be clearly restricted to a fail-

ure of issue at the time of the death of the first devisees respectively, the words being, "but if either of them dies before the age of twenty-one years, and without issue, then," &c. which construction, it is believed, is sustained by all the decisions on like expressions, that are worthy of consideration, and they are very numerous.   Relying then confidently upon the authority of the case of *Dallam vs. Dallam*, which was decided on much deliberation, for the correctness of the principles it asserts, and taking it as our principal guide, without again wading through the whole multitude of other authorities relating to the subject, but invoking to our aid such only as are thought to apply most directly to the devise in question, and examining such as are most relied upon by the counsel for the appellees, it remains only to be seen, whether the expressions used are such as import, in legal understanding, an "indefinite failure of issue," or a failure of issue "at the time of the death of the first devisees respectively."   If the former, we have seen, that according to the settled rules of construction, it is a contingency too remote to support an executory devise, and that the words "without issue," when applied to dispositions of real estate, *ex vi termini*, mean an indefinite failure of issue, if there be nothing in the will restricting it to a failure at the time of the death of the first devisee, or to some other time or event.

In this case the limitation over to the surviving son, is, in case either of them should die, "having no lawful issue or heirs of his body," and this word "having" is supposed to convey a different meaning from the word "without," and to distinguish it from the case of a limitation over on a dying "without issue." The force of that distinction is not clearly perceived; to have no issue, is to be without issue, and to die "having no issue," and to die "without issue," seem to be convertible terms, for to die without issue, is to die without having any issue.

But without pushing this discussion, it will be found, by reference to the authorities, that the question has long since been judicially settled, and that they are held to mean the same thing.   In *Sonday's* case, 9 *Coke* 127, there was a devise by a father to his son *Thomas* of a house, and "if he have no issue male," then to his son *Richard;* and the question was, "what estate did *Thomas* take?"   And it was resolved that he

took an estate tail.    Because, (in the language of the court) he (the father) saith, "if he hath no issue male, his son *Richard* to have it, which is as much as to say, if *Thomas* dies without issue male, which words are sufficient to create an estate tail in him.    In *Forth vs. Chapman*, 1 *P. Wms.* 663, the master of the rolls cited, and relied much upon *Lee's* case, 1 *Leo.* 285, where a father devised lands to his son, "and if he should depart this life not *having* issue," then over; which was resolved to be an indefinite failure of issue.    And in *Cooke vs. De Vandes*, 9 *Ves.* 197, it was held, that even in a bequest to one and the heirs of his body of a leasehold estate, with a limitation over "if he has no such heirs," the words "if he *has* no such heirs," point to an indefinite failure of issue, and the limitation over is void.    And in the same case a distinction was taken between those words, and the words "and if he *leaves* no such heirs;" which latter words "and if he leaves no such heirs," were on the authority of *Forth vs. Chapman*, held to mean a failure at the time of his death, when applied to a disposition of personal property; and in *Sir Samuel Romilly vs. James*, 6 *Taunton*, 263, "having no issue of either of their bodies," &c. was held to mean an indefinite failure of issue.

It was ingeniously urged in argument, that the limitation over to the *"surviving"* son, shows what the testator intended by the words "having no lawful issue," &c. and explains and restricts them to mean a dying by the other, without issue living at the time of his death; and in support of that position the counsel relied upon *Hughes vs. Sayer*, 1 *P. Wms.* 534. *Fosdick vs. Cornell*, 1 *Johns. Rep.* 440.    *Jackson vs. Blanshaw*, 3 *Johns. Rep.* 292.    *Moffett vs. Strong*, 10 *Johns. Rep.* 12.    *Jackson vs. Stoats*, 11 *Johns. Rep.* 337, and *Anderson vs. Jackson*, 16 *Johns. Rep.* 382.    *Hughes vs. Sayer*, is a case of a bequest of personal property.    And here it may be proper to remark, that though in respect to dispositions of personal property, courts generally incline to the construing a limitation after a dying without issue, to mean a dying without issue at the death of the first legatee, in order to support, if they can, the limitation over, and for that purpose lay hold on any word or circumstance in the will, however slight, that may seem to afford a ground for such a construction; yet that in relation

to real estate the construction is generally otherwise; and in order to tie up and confine the generality of the words "dying without issue," to a dying without issue living at the time of the death of the party, there must be something in the will clearly showing that to have been the intention of the testator, and restricting it to that time. And so far have courts gone in support of limitations of personal property, as sometimes to draw almost imperceptible shades of distinction. In *Forth vs. Chapman,* 1 *P. Wms.* 663, where the same words, "and leave no issue," &c. in the same clause of a will making a disposition of real and personal estate, were held in relation to the real estate, to mean an indefinite failure of issue, and as to the personal estate, a failure at the death of the first taker, the Lord Chancellor said, "the reason why a devise of a freehold to one for life, and if he die without issue, then to another, is determined to be an estate tail, is in favour of the issue, that such may have it, and the intent take place; but there is the plainest difference betwixt a devise of a freehold and a term for years; for in the devise of the latter to one, and if he die without issue, then to another, the words, *if he die without issue* cannot be supposed to have been inserted in favour of such issue, since they cannot by any construction have it;" and the same is said in *Target vs. Gaunt,* 1 *P. Wms.* 432.

Upon the ground of the distinctions, which courts have felt themselves authorised to take, between cases of real and personal estate, the case of *Hughes vs. Sayer* was determined, and is not, therefore, deemed applicable to this case. There the limitation over was of personal property to the survivor of two legatees, on the contingency of either of them dying without "children," and it was determined, that if the word "children" should in that case be understood as synonymous with "issue," the limitation over would be void. But that it could not be taken in that sense, (which would mean whenever there should be a failure of issue;) because the immediate limitation over, was to the survivor, and it was not probable, that if either of the legatees should die leaving issue, the survivor would live to see a failure of issue, and, therefore, the word "children," was construed not to mean "issue," but "children living" at

the time of the death of the parent. In *Hope vs. Taylor*, 1 *Burr.* 268, where there was a disposition of the whole of the testa-tor's real and personal estate to several, with a limitation over to the survivors, if either should die without issue lawfully be-gotten, it was adjudged to be an estate tail in the real property, and that the limitation over of the personal estate was void be-ing after "a dying without issue." Here we have a clear evi-dence of the lengths to which courts will go, and of the wire drawn distinctions that are taken in support of limitations of personal property. In both these cases, a limitation over of personal property after a failure of "issue" generally, was held to be bad; but in *Hughes vs. Sayer*, because the word "chil-dren" was used instead of "issue," it was construed to mean a dying without children at the time of the party's death. But has that case any resemblance to this? Most clearly it has not. There the limitation was of personal property, and, being also entirely personal to the survivor, (the legatee over,) unless it vested in the compass of the life of such survivor, it never could by any possibility take effect at all, there being no person beyond him, in whom it could vest. But is that this case? Here the devise is of real estate, and the limitation over, to the survivor and his heirs. It is not necessary, therefore, to give effect to the limitation over, that the survivor should be alive at the happening of the event on which it is made to de-pend—the failure of issue. The whole property by the devise, is to go over, on the happening of that event, to the survivor in his own person, if living, and if dead, to his heirs who would be capable of taking at whatever period of time the failure of issue might happen. *Fosdick vs. Cornell* was a case of real estate, where the devise was by a father, of different por-tions of his estate, to different children, in fee, with a limitation of the lands over to the survivors, to be equally divided between them, "if any of them should happen to die, without heirs male of their own bodies." *Thompson*, J. in delivering the opinion of the court, cited *Keily vs. Fowler*, *Fearne's Ex.* Dev. 236. *Pells vs. Brown*, Cro. Jac. 590. *Porter vs. Brad-ly*, 3 *T. R.* 145. *Hughes vs. Sayer*, 1 *P. Wms.* 534, and *Roe vs. Jeffery*, 7 *T. R.* 589. *Keily vs. Fowler* was referred to for the benefit of the observation of Lord Chief Justice *Wil-*

*mot*, "that he would lay hold of the most trifling circumstance to give effect to the apparent intention of the testator." But let it be observed that the question in that case arose on a bequest of personal property, in relation to which we have seen on what slight grounds courts have construed a dying, &c. without issue, to mean, without issue living at the death of the first taker. But not so in relation to real estate, where the introduction of the word "issue," &c. is supposed to be intended by the testator for the benefit of such issue, who, if there should chance to be any, might take after the father's death. But in relation to personal property, the same intention is not ascribed to the testator, for the reason assigned in *Forth vs. Chapman,* and *Target vs. Gaunt,*" that in such case, the father takes the whole, which on his death, will not go to his issue, but to his executors. *Pells vs. Brown,* was decided on the force of the peculiar expressions used in the devise, "if he died without issue *living William* his brother," then to *William*, &c. which do not belong to the limitation now under consideration. *Hughes vs. Sayer*, seems to have been much relied upon. Judge *Thompson* says, in his argument, "if the reason assigned for the decision in that case be solid, it applies with full force to the one before the court; the only difference between the two cases is, that the one relates to personal, and the other to real estate." And that, with very great deference, is conceived to be a material difference, seeing the settled distinctions which have been taken between dispositions of those different descriptions of property.

There is however another difference between the two cases, I mean a difference between the particular expressions used. In *Fosdick vs. Cornell,* the words are, "without heirs male;" in *Hughes vs. Sayer,* "without children;" and it is worthy of remark, that in that very case of *Hughes vs. Sayer*, a distinction was taken between the words, "children" and "issue," in order to sustain the limitation over, on the ground, that if the word "children" was to be understood in that case, in the same sense as "issue," which meant, whenever there should be a failure of issue, the bequest over would be void, the contingency being too remote; and there too, the limitation over was to the surviving legatee. So that proceeding upon that distinc-

tion, *Hughes vs. Sayer* would rather seem to be an authority against the construction given to the devise in *Fosdick vs. Cornell.*

It has also been seen, that in *Hope vs. Taylor,* a limitation over of personal property to the "survivor" on a dying "without issue," was held to be void, as on too remote a contingency. In *Porter vs. Bradley* the words are "leaving no issue behind him;" and if it be admitted that that case was properly decided on the peculiar expressions used, yet it is a very different case from this, the words here being, "having no lawful issue," &c. It is true, that Lord *Kenyon* in his observations, went farther than the case required, and said, that if only the words "leaving no issue" had been used, and the words "behind him" omitted, they would be restrained to leaving issue at the time of the death. And denied the distinction taken in *Forth vs. Chapman,* between the effect of the same words "and leave no issue," as applied to real and personal property, in which he certainly is not sustained. Indeed afterwards in *Daintry vs. Daintry,* 6 *T. R.* 307, where the disposition was of all his real and personal estate, by a father to his son, with a limitation over to his brother, "if his son should happen to die without *leaving* issue of his body," the same judge determined, that the son took an estate tail in the real estate; but that the limitation over of the personal property was good, the contingency not being too remote; and said it was precisely like the case of *Forth vs. Chapman.* Which case of *Forth vs. Chapman* has never been shaken. In *Roe vs. Jeffery,* the devise was to *T. F.* of real estate, and his heirs, "but in case he should depart this life and leave no issue," then the house, &c. to go to *E, M* and *S,* or the survivor or survivors of them, to be equally divided between them, share and share alike. And the limitation over was held to be good by way of executory devise. "The principal reason" (says Judge *Thompson,*) "assigned for this conclusion was, that the devise over was to persons then in existence." It would seem, however, as if the point of that case, had not been attended to, for simply the devise being to persons in existence, w s not the principal reason of the decision; but the limitation over being *for life,* to persons *in esse,* was the circumstance most relied upon.

No such circumstance exists here; on the contrary, the limitation over to the surviving son, is in fee. Looking to the grounds then, on which *Fosdick vs. Cornell* was decided, (and in *Anderson vs. Jackson*, we are told by Chancellor *Kent*, who was the presiding judge at the time, that *Porter vs. Bradley* and *Roe vs. Jeffery* were the guides to that decision,) we cannot yield to the authority of that case, in giving a construction to the limitation over in this will, to the surviving devisee. *Jackson vs. Blanshaw*, *Jackson vs. Stoats*, and *Anderson vs. Jackson*, are made to rest on the authority of *Fosdick vs. Cornell*; and in *Moffett vs. Strong*, the question relates to personal property. But the authorities are more than abundant to show that the circumstance of a limitation over being to a surviving devisee, has not the controling force contended for. In *Shadoch vs. Cowley*, Cro. Jac. 695, the devise was to *A*, and his heirs, of land in *B*, and to *C*, and his heirs, of land in *D*, and that the survivor should be heir to the other, if either died without issue. The question raised was, whether they took immediate estates tail, or contingent estates? And it was held, that they respectively took immediate estates tail, with cross remainders in fee. And the court took a distinction between such a devise, and a devise to one, and if he die without issue "in the life of another," or "before such an age." No two cases can be found bearing a closer resemblance to each other than that, and this. In *Hope vs. Taylor*, before adverted to, the limitation is in these words, "if either of the persons before named, die without issue lawfully begotten, then, &c. shall be divided equally between them that are left alive;" and *Roe vs. Scott & Smart*, 27 Geo. III, to be found in a note in *Fearne's Ex. Dev.* 473, is of the same character and exactly in point. It cannot be necessary to prosecute this part of the inquiry any farther.

The limitation over to the daughters, is on the contingency of both the sons dying, "*leaving* no lawful heirs of their bodies;" and it has been supposed, on the authority of *Porter vs. Bradley*, that the word "leaving," restricts it to issue living "at the death of the party," consequently that the contingency is not too remote, and that the limitation over to the daughters is good by way of executory devise. But that word "leaving,"

as well as "having," and "without," has acquired a technical judicial sense, and like them, when applied to real estate, means an indefinite failure of issue. It was so held in *Forth vs. Chapman;* but otherwise in relation to personal property, though both embraced in the same devise. In *Denn vs. Shenton, Cowp.* 410, where the limitation over was of real estate, after a dying without "leaving" issue, &c. it was held to pass an estate tail to the first taker; and the distinction, when applied to personal property, was expressly stated by Lord *Mansfield.* In *Porter vs. Bradley* it is true, Lord *Kenyon* denied that such a distinction existed, though that case was decided on its peculiar expressions. But afterwards in *Daintry vs. Daintry*, he himself adopted, and acted upon, the same distinction. And in *Tenny vs. Agar,* 12 *East,* 253, where, after a devise in fee to a son and daughter, there was a limitation over in fee, in case the first devisees "should happen to die without leaving any child or issue," it was held, that the first devisees took an estate in tail, Lord *Ellenborough* took occasion to speak rather uncourteously of *Porter vs. Bradley.*

It was further urged by the defendants' counsel, that the limitation over to the daughters, being only of a life estate, the words "leaving no lawful heirs of their bodies," must be construed to mean, *issue living at the death of the surviving son.* And that is a point not without difficulty; the question being, whether the circumstance of a limitation over, being only of a life-estate, to a person *in esse*, shall have the effect to narrow and restrict the established legal meaning of the words, "an indefinite failure of issue," to a failure at the death of the first taker? If it arose on a bequest of personal property, there would, perhaps, at this day, be little room for doubt; the word "leaving," alone, being held sufficient to restrict the limitation to a definite failure of issue, on the settled judicial distinction between cases of real and personal estate. And perhaps in such a case, that word "leaving," would derive additional force from the circumstance of the limitation over being only for life. But *Roe vs. Jeffery,* which was a case of real estate, has been cited and much relied on in support of the restricted construction contended for of this devise; and the decision in that case produces the only difficulty that is felt in this. There,

however, the word "*leave*" was chiefly relied upon in argument, as having the effect to show that the testator meant a failure of issue at the death of the first taker, on the authority of *Porter vs. Bradley*; in which the distinction taken in *Forth vs. Chapman*, (where the words are the same as in *Roe vs. Jeffery*,) between a devise of a freehold, and of a chattel interest, is rejected by Lord *Kenyon*, who said "it would be very strange if these words had a different meaning when applied to real and to personal property," and that "the distinction was not founded in law." And yet it has been seen, that afterwards in *Daintry vs. Daintry*, the same judge expressly recognized and adopted that very distinction. Notwithstanding which, he said in *Roe vs. Jeffery*, that "he was not prepared to unsay what he had said in *Porter vs. Bradley*." And although he adverted to the circumstance, that the limitation over was to persons then in existence, and that life estates only were given to them, as tending to show that the testator intended a failure of issue at the death of the first taker; yet it is clear that he did not rely upon that alone, but only called it, as a mere circumstance, in aid of the words "and leave no issue," which alone, in *Porter vs. Bradley*, he had construed to mean, issue living at the death of the first devisee; but which we have seen is contrary to all the authorities; that expression in relation to real estate, having the same established, technical import, as the words "without issue;" that is, a failure of issue whenever that may happen, without reference to any particular time or event. *Roe vs. Jeffery*, therefore, can only stand on the ground, that the circumstance of a limitation over, being of a life estate to one *in esse*, is of itself sufficient to restrict the meaning to a definite failure of issue, on the supposition that the testator must, in such a case, have so intended; because, the limitation must take effect, in the course of a life in being, if at all, a ground on which alone Lord *Kenyon* did not himself choose to rest it. And in *Denn vs. Shenton, Cowp.* 410, where the devise was to one, and the heirs of his body, and their heirs forever, and in case he should die "without leaving issue of his body," then to W. G, in fee, chargeable with the payment of one hundred pounds to A, the testator's niece, within one year after W. G, or his heirs, should

be possessed of the premises, it was held, that the first devisee took an estate tail. And Lord *Mansfield* asked Mr. *Cowper*, "if he knew of any case where, upon a dying without issue, those words had been confined to a dying without issue living at the time of the death," and said the distinction was between a devise of lands and personal estate; that in the latter case, the words were taken in their vulgar sense, that is, "dying without issue living at the time of his death;" and in the former, in a legal sense, that is, "when there is a failure of issue." And yet in that case the testator would seem to have contemplated the limitation over taking effect, within the compass of a life in being, the payment of the legacy being directed to be made to his niece then in existence, within one year after the devisee over should be possessed of the premises; which could not be, unless the contingency, on which the limitation was made to depend, happened in the lifetime of the niece. And that case looks quite as much to a definite failure of issue, as *Roe vs. Jeffery;* but the court held themselves bound by the technical legal sense of the words, and not at liberty to adopt their vulgar sense. In *Fearne's Ex. Dev.* by *Butler*, 488, and 2 *Thomas's Co. Litt.* 648, 649, *(note* c,) it is said, that an executory devise for life to one *in esse*, to take place after a dying without issue of another, *"may be good;"* and they both refer to *Lyde vs. Lyde*, 1 *T. R.* 598, and *Trafford vs. Boehm*, 3 *Atk.* 449, which are both cases of personal estate.

The distinction, as has often been observed, is between real and personal estate; and narrow as that distinction may seem to be, it is sanctioned by the different rules of law, applicable to these respective species of property. If there be a devise to one generally, of freehold and personal estates, without any words of limitation, it is very clear that he will take an estate for life only in the freehold, but the personal property absolutely; though it is most probable that in such a case the testator means to give the same absolute interest in both.

The rule is, not that the *"limitation"* over must take effect within a life in being, or not at all, but that the *"contingency,"* on which it is made to depend, must happen, (if at all,) within the compass of a life or lives in being, and 21 years and a few months afterwards; and the distinction is a very clear one. As

if there be a limitation over, "*for life, to one in esse,* on the failure of issue of the first devisee, whenever that may happen." There the *event* on which the limitation is made to depend, *may* happen within a life in being; or it *may not* happen within that period, but many generations after; and yet the *limitation* being for life to one *in esse,* must take effect, if at all, within a life in being. But if the *limitation* over, be on a "dying without issue living at the death of the first taker," the *event* in which the limitation depends, (the dying without issue,) *must* happen. if at all, within the prescribed limits. The former is what is meant by an "*indefinite,*" and the latter by "a *definite*" failure of issue. And the several general expressions, "having no issue," "leaving no issue," and "without issue," when used in relation to real estate, meaning, according to the settled legal construction, an indefinite failure of issue, they must, whenever they are found in a will, be taken in their technical legal sense, unless there be something clearly demonstrating a different intention on the part of the testator, and restricting them to a failure of issue at the death of the first taker. And the circumstance in this case, of the devise over to the three daughters, being general, without words of limitation, and consequently giving only an estate for life in the premises, is not deemed sufficient to narrow down the legal import of the words "leaving no lawful heirs of their bodies," and to restrict them to mean a failure of issue at the death of the surviving brother; for *non constat,* that the testator so intended. Under that restricted construction, if *Joseph,* the surviving brother, had died leaving issue, and that issue had become extinct in one hour after his death, the daughters could never have taken the contingency on which the limitation to them was made to depend, that is, "the death of the brother without issue living at the time of his death," not having happened. And the testator could have had no conceivable motive for fixing the precise time of *his* son's death, as the epoch, at which the limitation to his daughters should take effect. On the contrary it would seem to have been the more probable intention, that the sons, and their posterity, if they should have any, should enjoy the property; but if they should have none, or having them, they should become extinct, then that it

should go to his daughters, (who were the next objects of his affection and benevolence,) if they should chance to be alive; and that it was the "failure of issue," and not "the mere time of his sons death," to which the testator looked in making the provision for his daughters. That failure *"might"* happen during their lives; and in the language of the Master of the Rolls, in *Barlow vs. Sotter,* 17 *Vesey* 479, that chance is what was given them. Suppose this question had been put to the testator, "if your sons should die leaving issue, and that issue should die in one month afterwards, how, in that event, do you intend your estate shall go under your will?" Would not the probable answer have been, why to my daughters surely. And yet that intention would have been defeated by the construction contended for, and the daughters never could have taken, if *Joseph* had died leaving issue, although that issue had died in one hour after his death. Whereas, according to the legal construction, that intention would be gratified, by the daughters outliving such issue.

Yielding then to the weight of authority, and construing this will according to the settled rules of construction, *Joseph* and *George Griffith,* as the law stood before the passage of the act to direct descents, took estates tail general, in the lands respectively devised to them, with cross remainders in tail general, remainder to *Sophia, Sarah* and *Nancy Griffith* for life.

The next question is, whether any, and what part of the lands so devised is liable for the debts of *Joseph Griffith,* the younger? which depends on the construction of the act to direct descents, (1786, *ch.* 45.) It is a matter of some surprise, that such a question should at this late day be open to discussion, and it is time that that act had received a judicial construction.

Before the passage of that act, it is very certain that estates tail were not liable for debts contracted by tenants in tail; but whether any change in that respect was effected by the operation of the act, is the question. The act provides, that if after its commencement, "any person seized of an estate in any lands, tenements or hereditaments, in fee simple, or fee simple conditional, or of an estate in fee tail to the heirs of the body generally, (created and acquired after the commencement of the act) shall die intestate thereof, such lands, tenements or heredi-

taments, shall descend to the kindred male and female of such, person," in the manner therein directed.    First.  To the child or children, and their descendants, if any, equally; and if no child or descendant, then to the kindred *ad infinitum*, on the part of the father, in equal degree equally, and if none such, then to the kindred on the part of the mother in equal degree equally, without end; and on failure of kindred on the part both of father and mother, then it is directed to go to the husband or wife, as the case may be, and to his or her kindred, in the same manner.    Thus the course of descents of estates tail general, acquired after the commencement of the act, is entirely broken, the interest of the reversioner or remainder-man destroyed, and the land made to pass by descent from the tenant in tail, precisely and in the very same course as if he was a tenant in fee simple.    By the act of 1782, *ch.* 23, the ancient mode of docking estates tail by common recoveries, is abolished, and power is given to any person or persons, seized of any estate tail, in possession, reversion or remainder, to grant, bargain, sell, and convey the same, in the same manner, and by the same form of conveyance, that a tenant in fee simple may. Lands then which are held in fee tail general, created and acquired since the commencement of the act to direct descents, may not only descend, but also be sold and conveyed in the same manner as if they were held in fee simple.    The idea has indeed been entertained, and in a quarter entitled to the greatest deference, *(Smith vs. Smith,* 2 *Harr. & Johns.* 314,) that the course of descents of estates tail general, is altered by the act to direct descents, only in this, that they are made *to de-*, scend to all the children of the tenants in tail, and their respective issue, instead of going, in the first instance, as before, to the eldest son, on the supposition that it could not have been the intention of the legislature to change the nature of such estates in violation of the intention of those by whom they might be created, and the rights of the remainder men; and that the provisions of the act relative to the collateral relations, are applicable only to estates in fee simple, and not to estates tail general.    But it will not surely be contended, that it was not a legitimate subject of legislation, and that the legislature had no right to prohibit thereafter the creation of estates tail

altogether.   And if that right be conceded, and conceded it must be, it follows, that they had a right to direct, in what manner lands, so held by subsequent creation, should descend. They have provided a course of descent, for lands held in fee tail general, created since the commencement of the act; and the inquiry is, How have they directed that such lands shall descend?   With respect to the intention of the legislature, we can only judge of their intention, by what they have done. The provision of the act is, that if any person seized of an estate in any lands, &c. in fee simple, or fee tail to the heirs of the body generally, (created and acquired after the commencement of the act,) shall die intestate thereof, such lands, &c. shall descend, &c.   What lands?   Why lands of which any person shall die seized in fee simple, or fee tail to the heirs of his body generally; and precisely the same course of descent is directed in relation to each.   It is admitted, because it cannot be denied, that lands held in tail general are made to descend immediately to all the children of the tenant in tail, and their respective issue, and not to the eldest son alone in the first instance.   And what is there to be found in the act by which the descent is confined to the *issue* of the tenant in tail, to the exclusion of collaterals?   Nothing surely in the letter of it, which is not equally applicable to lands held in tail general, as in fee simple. To bring in with the eldest son all the children of the tenant in tail, equally, is as contrary to the nature of an estate tail, and as much a violation of the intention of the maker, and the rights of the eldest son, as the letting in collaterals is a violation of the rights of the remainder-man.   And if the legislature intended to do the former, what is there to show that it was not ther intention to do the latter?   Nothing in the law itself.   And if we travel out of it in search of evidence that such was not their intention, there will be found quite as much difficulty in discovering it.   The truth is, that restrictions upon the descent and alienation of lands in this state were contrary to general policy, and the provisions of the act to direct descents grew out of a disposition to remove them.   In that spirit the act *to direct descents* was passed; and by it all lands held in fee simple and fee tail general, are directed to descend in one general uniform manner, (without any distinction being taken

between the two kinds of estates,) first to the child or children, and their descendants, if any, equally, and if no child or descendants, &c. then to collaterals indefinitely. And if the provision for the descent to the child or children, and their descendants, applies to both, then the provision for the descent to collaterals necessarily applies also to both. The *sixth section,* excepting from the operation of the act all estates tail created before its commencement, and all estates tail special, created subsequent to its commencement, and leaving estates general, executed subsequent to its commencement, out of the exception, proves that to be the correct construction. A different construction would be repugnant to the general spirit and other provisions of the act. When lands come to be divided according to the provisions of the act, between the children of a deceased tenant in tail general, what but an estate in fee can the children respectively take? Or if found to be not capable of division, and one elects to take the whole, paying to the others their respective proportions of the valuation, what but an estate in fee can the child so electing take? Or if they cannot be divided, and neither of the persons entitled will elect to take, and they are sold under the direction of the commissioners, what but an estate in fee can the purchaser in such case take? It is also worthy of notice, that the act of descents does not direct that the *estates tail* shall descend, but that the *lands,* &c. shall descend in the manner prescribed.

Upon the whole, it is clear that all lands held in this state in tail general, created since the commencement of that act, have all the descendible properties of lands held in fee simple; and having both the transferable and descendible properties of fee simple estates, being liable to disposition by a common deed of bargain and sale, it would seem to follow that they are deviseable also. The general rule is, that what is transferable is consequently deviseable, which holds more strongly when descendible likewise. The legislature, when giving to lands held in tail general the descendible quality of estates in fee, treats them as lands capable of being devised. The language of the act is, if any person seized of an estate in any lands, &c. in fee simple, or fee tail, to the heirs of the body generally, shall die *intestate* thereof, &c. Now as a man cannot be said to

die intestate of that which is not deviseable, the legislature must be understood as meaning, that the estates tail there treated of, should by the operation of that act be deviseable; in other words, that such estates should become estates in fee simple, otherwise they could not be deviseable.   If that is not what is meant, they were guilty of the absurdity of saying, that if a tenant in tail did not do, what by law he was incapable of doing, the land should descend, &c to his heirs generally.   If he did not devise away an estate, which, if an estate tail he could not devise, it should, therefore, on his death, cease to be an estate tail, and become a fee simple, and as such descend to his heirs generally.   The obvious understanding and intention of the legislature, in using the words "shall die intestate thereof," &c. was, that any person seized of an estate in tail general, created after the commencement of the act, might make a disposition by will of land so held, as it is not to be imagined that they were wholly ignorant of the import of the terms used, and supposed, that a dying by a tenant in tail, without leaving a will containing a provision for the disposition of the land held in tail, would be an intestacy as to such land, when by law, he was incompetent to dispose of it by will.   As well may he be said to die intestate of the estate of another, who leaves no will respecting it.   But if such was the understanding of the legislature, then it would follow, that they intended, that lands held in tail general, should descend in the manner directed by the *first section* of the act, in the event only of the tenant in tail omitting to do a perfectly nugatory act—the making a will, which if made would be altogether inoperative to pass the estate, and could in no manner affect the interest of the heir in tail, the remainder-man or the reversioner, more than if no will was made.   Which would amount to this, that if a tenant in tail general, should make no effort by will to dispose of the estate, the land should descend immediately on his death to all his children equally; but that if he should make an unavailable effort to dispose of it, by leaving a perfectly inoperative will, then it should not so descend, but should go as formerly to the heir in tail.   And what imaginable reason could there have been for that?   What sense would there be in it?   Why should such an effect be given to a paper purporting to be a will, but

having in law no operation at all, and amounting at most to no more than a mere ineffectual manifestation of a wish on the part of the tenant in tail to dispose of the land by will; but making in fact no disposition of it, and leaving it in the same condition as if he had died without executing such an instrument. But that is not what was meant; and the clear understanding of the legislature was, not a dying, without going through the mere form of executing an ineffectual instrument, but a dying without making a valid and operative disposition of the land by will. Thus considering and treating it as liable to be disposed of in that manner, and making no distinction between lands so held, and lands originally held in fee simple. But independent of that circumstance all estates are known by their properties, as the tree by its fruit; and that which has the properties of a fee simple, is a fee simple, and subject to all the incidents to such an estate; and lands held in tail general, created since the commencement of the act to direct descents, being made by that act to descend precisely in the same manner as lands held in fee simple, all such estates are thereby virtually abolished, and converted into estates in fee simple, drawing to such lands all the incidents to lands held in fee, among which is that of being liable for the debts of those who before that act would have been tenants in tail. Can it be doubted, that if a man so seized, should make a contract for the sale of the land, and receive the purchase money, that chancery would enforce that contract against his heirs to whom the lands would descend? And if so, on what principle can they be considered not liable for his debts? There can be no conceivable reason why a remainderman, more than a reversioner, should be respected and protected, the interest is the same, and neither in fact is protected; and it would be strange if he who creates an estate in the form of an estate tail, and cannot protect his reversionary interest in himself, could be able to protect it, by giving it in the shape of a remainder to another. And the legislature cannot be supposed to have intended to make such estates descendible as fee simples, only for the purpose of defeating the interest of the heirs in tail, the reversioners and remainder-men, in favour of collaterals *ad infinitum*, and in the event of there being none, of husbands and wives, and their heirs, indefinitely, and yet

to give to such lands none of the other incidents of estates in fee, but leave the creditors without remedy or protection. That was not the intention of the legislature, but making them to descend as lands held in fee they meant that they should so descend, subject to all the incidents of estates in fee simple; and that the heirs, who should take them, whether lineal or collateral, should take them *cum onere.*

In this view of the subject, *Joseph Griffith,* the younger, and *George Griffith,* by operation of the act of descents, took virtually estates in fee, in the lands devised to them respectively; and on the death of *George, Joseph* and his three sisters surviving him, *Joseph* took by descent from him one-fourth of his estate, which, with the whole of the lands devised to him by his father, descended on his death to his three sisters as his heirs at law, subject to be sold for the payment of his debts. As to so much, therefore, of the lands devised by *Joseph Griffith,* the elder, to his sons *Joseph* and *George,* respectively, the decree of the court below is reversed.

STEPHEN, J. dissenting, delivered the following opinion. The question to be decided in this case arises from sundry devises contained in the will of *Joseph Griffith,* who in his lifetime being seized in fee of sundry lands and tenements lying in *Dorchester* county, on or about the 6th of February 1792, made and published his last will and testament according to law, and therein, among other dispositions of his estate, devised his said lands to his two only sons, *Joseph* and *George Griffith,* and his three only daughters, *Sophia, Sarah* and *Nancy Griffith,* as follows, to wit: "I give and devise unto my son *Joseph Griffith* my present dwelling plantation whereon I now live, to him my said son *Joseph,* his heirs and assigns forever. *Item.* I give and devise unto my son *George Griffith* the plantation whereon *Levi Oram* now lives, lying on *Transquakin* river, or a branch thereof, to him, my said son *George,* his heirs and assigns, forever; and my will is, that all the land which I am now possessed of, either by deed, bond or patent, be equally divided between my said two sons *Joseph* and *George,* according to quantity and quality, share and share alike, to them their heirs and assigns forever; and in case ei-

ther of my said sons should decease, having no lawful issue, or heirs of his body, that then the surviving son to have his deceased brother's part or moiety of the land aforesaid, to him, his heirs and assigns forever, as aforesaid; and in case both my said sons *Joseph* and *George*, should decease, leaving no lawful heirs of their bodies, that then and in such case, I give and devise all my aforesaid lands, devised as aforesaid, unto my three daughters, *Sophia*, *Sarah* and *Nancy Griffith*, to be equally divided between my aforesaid three daughters." *George Griffith*, after the death of his father, departed this life intestate, and without issue, never having had any issue, leaving his brother and sisters surviving him. *Joseph Griffith* also departed this life intestate, and without issue, never having had any issue, leaving his sisters surviving him, all of whom are married and in possession of the premises. *Joseph Griffith*, the son, died indebted to sundry persons, and did not leave personal estate sufficient to pay his debts. His creditors filed a bill on the equity side of *Dorchester* county court against the daughters, and their husbands, for the purpose of obtaining a decree for the sale of the said lands, to pay their debts. A decree passed *pro forma* in favour of the respondents, from which the complainants appealed to this court. The questions to be decided by this court are *first*, What estates the sons took under the will of their father? And *secondly*, Did they derive under that will such an interest in the lands devised to them, as will subject those lands, under the circumstances of this case, to the payment of *Joseph's* debts? It is a well settled rule in the exposition of wills, that the intention of the testator, to be collected from the whole will, shall prevail unless it conflicts with some established principle of law; and as Lord *Kenyon* said in the case of *Wilkinson vs. South*, 7 *T. R.* 553, the only question is, whether on the fair construction of the words of this will, the testator meant that the limitation over to the surviving son should only take effect after an indefinite failure of issue of the first taker, or on a failure of issue living at the time of his death? For, he observes, as soon as that intention is discovered, there is an end of the case. So in the case of *Roe vs. Jeffery*, *Ibid* 591, his Lordship says, speaking on the subject of executory devises, "We had occasion a few days ago

to advert to this doctrine, when we said that this is a question of construction, depending on the intention of the party; and nothing can be clearer in point of law, than that if an estate be given to A in fee, and by way of executory devise an estate be given over which may take place, within a life or lives in being, and twenty-one years and the fraction of a year afterwards, the latter is good by way of an executory devise. The question therefore in this and similar cases is, whether from the whole context of the will we can collect, that when an estate is given to A and his heirs forever, but if he die without issue then over, the testator meant dying *without issue living at the death of the first taker?*" If the latter was intended in the case now before this court, the limitation over is within the legal limits, and good and available as an executory devise according to the law as settled in the above case. And it is further to be remarked that where it is the apparent intention of the testator to give a fee in the first instance, and there is then a limitation over on a failure of issue, to carry the intention of the testator into effect, the court will lay hold of the smallest circumstance to confine the failure of issue to the death of the first taker, so as to make the limitation over good as an executory devise. In the case last referred to, the devise was to T. F. and his heirs forever, and in case he should depart this life, and leave no issue, then to E, M and S, or the survivor or survivors of them, share and share alike; it was held that the devise to E, M and S, was a good executory devise. The reason upon which this decision was grounded, is strongly nay irresistibly decisive of the case now pending before this court. It was, that the persons to whom the property was limited over, were then in existence, and life-estates only were given to them. So here the daughters of the testator, *Joseph Griffith,* were in existence at the time he made his will, and life-estates only were given to them; and this fact strongly indicates the intention of the testator to confine the failure of issue to the death of his two sons; because the limitation over to the daughters was only to take effect on the death of both without leaving issue. The case of *Fosdick vs. Cornell,* 1 *Johns. Rep.* 440, is in principle strongly analagous to the present. The first devises were in fee, and the will provided that if any of the devisees should happen to

die without heirs male of their own bodies, that then the lands should return to the survivors, to be equally divided between them. Judge *Thompson*, in delivering the opinion of the court, remarks, "This is a question of construction, depending on the intention of the testator; and from the whole will taken together, I cannot entertain a doubt that he meant to provide, that in case any of the devisees, named in the clause, should die without leaving male issue at the time of his death, his portion should be divided among the survivors." The limitation over being to the survivors, seems to have had considerable weight in bringing him to the conclusion, that it was good by way of executory devise, it restraining the failure of issue to the time of the death of the first taker. The case of *Jackson vs. Blanshaw*, 3 *Johns. Rep.* 292, is strongly analagous to the case now before this court, or more, properly speaking, is a case in point, and decides the question which now awaits the determination of this tribunal. After giving some legacies, the testator devised to his six children their heirs and assigns forever, all the remainder of his real and personal estate, to be equally divided among them; but if any one of his children should die before full age, or without lawful issue, then his or her part to devolve upon, and be equally divided among the rest of his surviving children, to their heirs and assigns forever. In that case *Spencer*, Justice, in delivering his opinion, says, "The grandchildren cannot be considered as the surviving *children* within the intention of the testator." So in this case, the surviving son cannot be considered as the surviving grandson within the intention of the testator; and if not, then the limitation over to the surviving son, though in fee, is clearly good as an executory devise, and within the legal limits which the law indulges to a man's last will and testament in such cases. If then the devise over to the surviving son was good as an executory devise, *Joseph*, the son, did not take an estate tail, but took a defeasible fee, in the part devised to him by the will, and on the death of *George* without issue took the same estate in the part devised to *George;* and on *Joseph's* death without issue, the whole estate went over to the surviving daughters by way of executory devise for life. *Wooddisson*, in his lectures on executory devises, 225, says, there are two

sorts of executory devises, one where the fee-simple passes, another where the fee does not pass, but in the interim descends to the heirs. The example of the first sort which he gives is, where a testator devised to A, and his heirs forever, and if he died without issue living B, then B to have those lands, to him and his heirs forever; and, he says, it was adjudged that A took a vested fee simple. In this case, then, on the death of *George,* without issue, the whole fee simple in the lands devised vested in *Joseph:* and it was only on his death without issue that his right to the whole fee ceased; on that event the testator devised the lands to his daughters for life, leaving the fee undisposed of; but the daughters being then his heirs at law, the fee descended to them, and the life estates became merged in it. For it was only on the death of *Joseph,* without issue, that there was any interest or estate to vest in the heirs of the testator, the whole fee simple being in him during his life. According to this view of the subject the decree of *Dorchester* county court ought to be affirmed. No estate tail being given to *Joseph Griffith* by the will of his father, it is unnecessary to decide whether, if he had taken such an estate, it would have been liable, on his death, to the payment of his debts, under our act of assembly regulating the law of descents. The question is a highly important and novel one. In *Davis vs. Jacquin & Pomerait,* 5 *Harr. & Johns.* 109, this court in construing the law giving to females a right to possess their property at the age of sixteen, express themselves in the following manner: "That this act (1798, *ch.* 101,) has not in terms declared, that the infancy of females shall cease at the age of sixteen, will be admitted; and it is difficult to conceive why the legislature, if they intended to destroy this important feature of the common law, did not pointedly declare their intention, instead of leaving it to be inferred by reasoning." So here no part of the act of descents declares in terms, that an estate tail shall on the death of tenant in tail be liable for the payment of his debts, but only declares that it shall be descendible as a fee simple. If it had been the intention of the legislature to make so important a change in the law relative to estates tail, it is to be presumed they would have declared such intention in express terms, and not leave it to be collected

from argumentative inference or deduction. It has moreover been, it is believed, the universal understanding, that estates tail were not liable for the debts of tenant in tail; and the practice has been to dock such estates in the manner prescribed by the act of 1782, *ch.* 23, as well since and before the act of descents. This last mentioned act speaks of the tenant dying seized of an estate tail, intestate thereof; recognising the continuance of the entail to the time of the tenant's death, and giving it only the properties of an estate in fee, as to the course and manner of its descent after his death. In 1 *Bacon's Abridgment*, 703, the law is stated to be, that the estates of copyholders shall descend to their heirs, and such descent shall be governed by the rules of the common law, but not to have all the collateral qualities of estates in fee simple; for it is not assets in the heirs hands; so that the circumstance of the lands being made descendible to the heirs general, in the same manner as fee simple estates, is not, it seems, sufficient *per se* to make them liable in the hands of the *heirs* for the debts of the ancestor. But that lands held in fee tail general, have not all the qualities and attributes of estates in fee simple, it is only necessary to refer to the act of 1798, *ch.* 101. That act declares that all lands which might pass by deed, or which would in case of intestacy, descend to or devolve on "his or her heirs, or other representatives," except estates tail, may be disposed of by last will and testament. The Supreme Court of the *United States*, in *Stuart vs. Laird*, 1 *Cranch*, 309, in speaking of the effect of a practice under a law, say, that practice and acquiescence under it for a period of several years, fixes the construction. It is a contemporary interpretation of the most forcible nature. Such a practical exposition is too strong and obstinate to be shaken or controled. That such a construction puts the question at rest, and that it ought not to be disturbed. So here the long understanding and practice under the act of descents, puts the question at rest, and it ought not now to be disturbed. I am of opinion that the decree ought to be affirmed.

DECREE REVERSED, *(a.)*

*(a)* The doctrine that "if there be a devise to one generally of freehold, without any words of limitation, he will take an estate for life only

in the freehold," is changed in this state by the act of 1825, *ch.* 119, by which it is enacted, that after the 1st of April 1825, devises of land or real property, without words of perpetuity or limitation, shall pass the entire estate of the testator in such property, unless it shall appear by devise over, or by words of limitation, or otherwise, that the testator intended to devise a less estate.