# Mary Ann Simpers, lessee, *vs.* Henry D. Simpers.

A testator by his will, executed in 1805, devised real estate to his natural son, Henry, "*for and during the term of his natural life,* and, after his decease, to his eldest son" for life, and, "*in default of such issue*" on the part of Henry, to the testator's natural son, William, "for and during the term of his natural life, and, after his death, to his eldest son" for life, and, after the death of such eldest son, "to the eldest son of such son and his issue male of his body, lawfully begotten," but if his natural son Henry "shall have a son as aforesaid, and such son should die *without issue male,* in that case," if Henry should "have *a second son or any heir male of his body,* lawfully begotten," then "such son *or heir male*" shall have the said real estate, "to him and his eldest heir male forever, it being my will that the said property should pass from my said son Henry to his eldest son and heir of his body, lawfully begotten, *and so on, from generation to generation, forever,* and, *in default of such issue,* to my son William and his eldest son, as aforesaid." Held:

That under this will, Henry took an estate tail male by force of the rule in *Shelley's case,* which, with its exceptions or qualifications, has been fully recognized and adopted as the settled law of Maryland.

When there is a particular intent expressed in a will, and a *general intent,* inconsistent therewith, expressed in the same will, the *latter* must prevail.

 Appeal from the Circuit Court for Cecil county.

 *Ejectment* for a tract of land, called "Home Place," brought on the 3d of August 1852, by the appellant against the appellee.

The case was submitted to the court below upon an agreed statement of facts, by which it was admitted that, in 1805, Thomas Simpers, the elder, died seized in fee of the lands claimed in this suit, leaving a will, duly executed, to pass real estate, dated the 16th of December 1805, in which are the following clauses:

"*Secondly.* I give and devise unto my natural son, Henry Simpers, son of Mary Boulden, all my present dwelling plantation, &c.," (being the land in dispute,) and also certain negroes, and other personal property, "to him, the said Henry Simpers, (son of Mary Boulden,) for and during the term of his natural life; and, after his decease, to his eldest son, for and during the term of the natural life of such eldest son; and, in default of such issue on the part of the said Henry, I give, devise, and bequeath the property, real and personal aforesaid, hereby given to the said Henry, unto my natural son William Simpers, (son of Mary Boulden,) for and during the term of his natural life; and, after his death, to his eldest son, for and during the term of the natural life of such son; and, after the death of such eldest son, to the eldest son of such son and his issue male of his body, lawfully begotten, forever; but if my said natural son Henry Simpers, (son of Mary Boulden,) shall have a son as aforesaid, and such son should die without issue male, in that case, it is my will and intention, that if the said Henry should have a second son, or any heir male of his body, lawfully begotten, that such son or heir male should have the aforesaid property, real and personal, to him and his eldest heir male forever; it being my will that the said property should pass from my said son Henry Simpers, to his eldest son and heir of his body, lawfully begotten, and, so on, from generation to generation, forever; and, in default of such issue to my son William and his eldest son as aforesaid; and if my said son William should die without issue male, then I give and devise the property aforesaid, both real and personal, to my son John Simpers, (son of Mary Boulden,) in the same manner, and under the same limitations and restrictions, and upon the same conditions, as the same is devised and be-

21      v. 15

queathed to my son William, (son of Mary Boulden,) and if the said John Simpers should die without such issue, then I give, devise and bequeath the property aforesaid, both real and personal, to my son Richard Simpers, (son of Mary Boulden,) in the same manner, and upon the same conditions, and subject to the same limitations, as the same is given, devised and bequeathed unto the aforesaid John Simpers, (son of Mary Boulden,) and if the said Richard should die without such issue, I give, devise and bequeath the property aforesaid unto my natural son Thomas Simpers, (son of Mary Boulden,) in the same manner, and under the same conditions and limitations, as the same is given, devised and bequeathed unto the said Richard Simpers, (son of Mary Boulden.)

"*Thirdly.* I give and devise unto my natural son Thomas Simpers, (son of Mary Boulden,)" certain other real estate "to him, the said Thomas Simpers, in the same manner, and subject to the same conditions, limitations, remainders, and restrictions, as the lands hereinbefore given, devised, and bequeathed unto my natural son Henry Simpers, are hereinbefore subjected to; also, upon the same terms and in the same way, I bequeath unto the said Thomas Simpers," certain negroes, "and it is moreover my meaning in this devise and bequest, that, if the said Thomas Simpers should die without issue male, that my aforesaid son Henry Simpers, (son of Mary Boulden,) should have the land and negroes hereinbefore devised and bequeathed unto the said Thomas Simpers, upon the same terms as the property hereinbefore devised and bequeathed unto him.

"*Fourthly.* I give, devise, and bequeath to my third natural son, John Simpers, (son of Mary Boulden,) one undivided moiety of" certain other real estate, "during his natural life, and, after his death, to his eldest son and his eldest issue male, forever; and, in default of such issue, to my fifth natural son William Simpers, (son of Mary Boulden,) during his natural life, and, after his death, to his eldest son, in tail male forever; also, I bequeath unto my said son John Simpers, (son of Mary Boulden,) upon the same terms as are

expressed in the devise and bequest aforesaid, to my before-mentioned natural son Thomas Simpers," certain negroes.

"*Fifthly.* I devise to my fourth natural son Richard Simpers, (son of Mary Boulden,)" certain other real estate and certain negroes "to him, the said Richard Simpers, for and during his natural life, and, after his death, to his eldest son and to the eldest issue male of such son forever, and in default of such issue to my fifth natural son William Simpers, (son of Mary Boulden,) and his eldest issue male, in tail male, forever.

"*Sixthly.* I give and devise to my fifth natural son, William Simpers, (son of Mary Boulden,) the one undivided moiety of" the real estate of which he had before given the other moiety to his son John, and certain negroes, and a pecuniary legacy, "to the said William Simpers, during the term of his natural life, and, after his death, I give and devise the land aforesaid, to his eldest son, and the eldest issue male, lawfully begotten of such son, forever; and, in default of such issue, to my beforementioned son, John Simpers, (son of Mary Boulden,) and his eldest son, and the eldest male issue of such son, lawfully begotten, forever."

It was further admitted, that, after the death of the testator, his son, Henry Simpers, entered into possession of the land so devised to him; that, on the 12th of April 1841, Henry Simpers and his brother, Thomas Simpers, conveyed their interest in the land to Wm. Kilgore, who, on the same day, reconveyed the same to the said Henry Simpers; that said Henry died in 1820, in possession of the land, leaving two children, Thomas H. Simpers and Mary Ann Simpers, his heirs at law; that, after the death of said Henry, the land was sold by Kilgore, as trustee, to pay the debts of the said Henry, in virtue of a decree of Cecil county court, regularly obtained against the said Thomas H. Simpers and Mary Ann Simpers, who were parties defendants to the decree, which was passed on the 18th of April 1821, at which time the said Thomas H. Simpers was an infant under the age of twenty-one years; and, at the sale, Jemima Simpers, the widow of the said Henry, became the purchaser of the land,

and, on the 7th of April 1825, received a deed therefor from the trustee; that the said Jemima Simpers died on the 31st of July 1836, in possession of the land, leaving the said Thomas H. Simpers and Mary Ann Simpers her only heirs at law, who entered into possession thereof, and held the same till the 12th of January 1837, when the said Thomas H. Simpers died, intestate and without issue, being then twenty-eight years of age, leaving the said Mary Ann Simpers, the plaintiff's lessor, his heir at law.

"The questions on the aforegoing statement of facts, for the opinion of the court, are, what estate did Henry Simpers take under the will of his father, Thomas Simpers? If the court shall be of opinion that the said will conveyed a larger estate than an estate for life to Henry Simpers, the devisee; or, if the court shall be of opinion that the said Jemima acquired a fee-simple in said lands, by her purchase from Kilgore, trustee; or, if the court shall be of opinion that the said Thomas H. Simpers had such an estate in said lands as would descend to his heirs generally, and that the same did descend from the said Thomas H. Simpers to the said Mary Ann Simpers, then judgment to be entered for possession and costs;—but, if the court shall be of opinion that an estate for life only passed by said will to said devisee, Henry Simpers, and shall also be of opinion that the said Jemima Simpers did not acquire a fee-simple in said land by her said purchase, and shall also be of opinion that the said Thomas H. Simpers had not such estate in said lands as would descend, on his death, to the said Mary Ann Simpers, then judgment to be entered for the defendant for costs, and each party reserves the right of appeal."

Upon this statement of facts and agreement, a *pro forma* judgment was entered by the court (PRICE, J.) in favor of the defendant, and the plaintiff appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*Ot'ho Scott* and *Alex. Evans*, for the appellant, argued:

1st. That by the will of Thomas Simpers, his son, Henry Simpers took an estate tail which was converted into a fee by the conveyance and re-conveyance to said Henry.

2nd. That Jemima Simpers acquired a fee-simple by her purchase under the decree even if Henry Simpers had but a life estate, the tenant in tail, T. H. Simpers, being a party to that decree.

On the first point, we think, that Henry Simpers, according to the fixed rules of construction, took an estate tail male, under the will of Thomas Simpers. In all periods of the law there has been much difficulty and discussion in construing limitations in devises, partly arising from obscure phraseology but more from testators making bequests against the rules of law.

It is a general rule, that the intention of the testator is to be followed when it can be ascertained, but this rule has several established exceptions to it; one is, a perpetuity cannot be created; another is, if an estate for life is given to one, with remainder in fee or in tail to his heirs, the first devisee takes an estate of inheritance; and the fixed legal meaning of the phrases *"dying without issue,"* and *"dying without leaving issue,"* seem to control the intention of the testator; for, we presume, no one ever supposed a testator meant, by either of these phrases an *indefinite* failure of issue; on the contrary, when applied to bequests of personalty, they sometimes receive a different interpretation from that given to them in the same clause of the same will when applied to the realty. *Newton vs. Griffith,* 1 *H. & G.,* 111.

In fact, the rule in *Shelley's case,* and the rules in *Newton vs. Griffith,* are fixed principles of the law, and must regulate the transmission of real estate, without reference to the intention of the testator. The titles to a large portion of the land in the State, rest on these principles, and great confusion would be produced by their disturbance. The intention of testators must conform to these rules or they are disregarded. For example, the rule in *Shelley's case* never applied to any case, without giving an estate of inheritance to the

Simpers' lessee *vs.* Simpers.

first devisee, when it was manifest that the testator intended he should only take an estate for life.

In *Shelley's case*, itself, the limitation was to E. Shelley, for the term of his life, without impeachment for waste, then to C. and others for twenty-four years, and after the twenty-four years, then to the heirs male of the body of E. Shelley, and the heirs male of the body of such heirs male. Can any one doubt that the intention in this case was to give but a life-estate to E. Shelley ? Not only are apt words used to give only a life-estate, but if any larger estate was intended to be given, why add, without impeachment for waste? Tenants in tail, or fee, cannot be impeached for waste.

This famous rule, when sought to be applied to the multiform devises brought before the courts, has led to some nice distinctions in the meaning of words and phrases. The same word sometimes being a word of limitation and sometimes a word of purchase, according to the sense as gathered from the context. The cases involving these questions furnish no aid in settling the construction of this will. Nor shall we cite the numerous cases, where it has been a question, whether the rule in *Shelley's case* applied, for these cases differ more or less from each other, and all of them differ widely from this. The only rule which can be extracted from all the cases, and which must be applied to this and all other limitations by will, after a life-estate, is this: where the remainder, after the life-estate is given to the heirs general or special, as a class, to take in succession from generation to generation, and not given to some individuals of the class of heirs, with a limitation to the heirs of such individuals, then the rule in *Shelley's case* applies. When the devise over makes a new stock, from which heirs are to spring, the first devisee takes but a life estate. But when the devise over is to a class of persons to take in succession, and that class comprises all (and no one else) of the heirs general or special of the devisee for life, then his estate is enlarged to an estate of inheritance.

Let us now see what devise was made to Henry Simpers. He is first given a life-estate with remainder for life to his

eldest son, and if he has no eldest son, then to William for life, remainder to his eldest son for life, remainder to the eldest son of such eldest son and his issue male. If the will had stopped here, Henry Simpers would have had but a life-estate with the remainder to his eldest son for life.    This interpretation supposes the testator meant by the phrase, in this part of his will, "in default of *such issue*," Henry's having no eldest son.    If this was his meaning, then he had only given Henry an estate for life, with a contingent remainder to his son for life, with a contingent remainder for life to William and his eldest son, with a limitation, which is void as a perpetuity, to his grandson in tail male.

But the testator did not mean that the land should go to William upon Henry's dying without an eldest son, but meant by, "on default of such issue," a general failure of heirs male.    If this was not his meaning how would the land have gone if Henry had had a son?  The remainder to William was contingent on Henry's having no son, if "such issue" means eldest son, and as the eldest son only takes for life, the land on his death would have passed to the heirs of the testator's father; these devisees being illegitimate, could not inherit from the testator.    But the intention of the testator was to give the land to the heirs male of Henry, and on failure of heirs male on the part of Henry, then to William, and therefore did not mean, by the words, *"such issue,"* the eldest son of Henry, but meant by it all the male heirs of the body of Henry.

If, then, the remainder to William was after a general failure of heirs male on the part of Henry, it gave Henry an estate tail male by implication.    By reading the latter part of the devise it will be seen, that the testator intended the remainder to William to take effect, only after a general failure of heirs male on the part of Henry.  He says, *"that if my son Henry should have a son, and such son should die without* issue male, in that case it is my will and intention, that if the said Henry should have a second son *or any heir male* of his body, lawfully begotten, that such son or heir male," &c.; and he repeats, "it being my will that the said property

should *pass·from my said son, Henry Simpers, to his eldest son and heir of his body, lawfully begotten, and so on from generation to generation forever.*"

. The intention of the testor to limit the estate to any heir male of Henry Simpers seems clear; there is nothing in the will to confine the bequest to any particular persons, or children, or sons, to bring it within the range of those cases to which the rule in *Shelley's case* does not apply. On the death of Henry Simpers, the testator intended the lands to pass to his eldest son and heir of his body, and so on, &c. The testator does not mean the heir of the son's body, but the heir of Henry's body, because such a construction would exclude a *second son or any heir male*, which are to take under the previous words of the will. It was not the intention by the last part of this devise to give the estate to William Simpers, on the eldest son of Henry failing to have issue. The phrase, in default of such issue, must therefore refer to the issue of Henry, and this view is confirmed by the next bequest, where the testator limits this same estate to John, if William should die without issue male. In the case of *Lyles vs. Digges*, 6 *H. & J.*, 364, it was held, where there was a limitation in tail to the first and other sons successively, that the sons took by purchase. But, it is well settled, that where any of the sons are omitted and the limitation over is on failure of such issue, the first devisee takes an estate in tail. In the case we are considering the testator did not intend the lands should go to William Simpers, if there was any heir male of Henry. For instance, if Henry had died leaving a grandson, a son of his third son, the first and second sons having died without issue, such grandson would have taken. It may be safely assumed, as a settled rule of construction, that a devise to one for life, with remainder to his first, or any portion of his sons successively, not including all, in tail male, with a limitation over, on failure of *such issue*, the words, "such issue," mean the issue of the devisee for life, and enlarge his estate to a tail male; see *Attorney Gen. vs. Sulton*, 1 *Peere Wms.*, 754; *Robinson vs. Robinson*, 1 *Burr.*, 38, *Doe vs. Applin*, 4 *Term Rep.*, 82; *Denn vs.*

*Puckey,* 5 *Term Rep.,* 299; *Doe vs. Smith,* 7 *Term Rep.,* 531; *Doe vs. Cooper,* 1 *East,* 229, and 5 *East,* 548, *Pierson vs. Vickers.*

These cases are sufficient to establish this rule, though the list might be almost indefinitely extended; many of the cases are stronger in showing that a life-estate was only intended for the first devisee than this.    The case of *Robinson vs. Hicks,* for instance, there the devise was to H. for life and *no longer,* and after his death to such son as he should have, and in default of such issue over, it was held, that H. took an estate in tail male.    Wherever it is obvious that the testator does not intend that the devise over shall not take effect till after a failure of the heirs male of the first devisee, the first devisee has been held to have an estate in tail male, and this construction is necessary to carry out the general intent of the testator, which is always regarded in preference to some particular intent which might be found in part of the will.    The particular intent is made to yield to the general intent.    In this case, if the testator's particular intent was, that Henry Simpers should only take a life-estate, his general intent was, that any heir male of Henry should take before William, and this general intent can only be gratified by giving Henry an estate in tail male.

On the second point, it is contended, that Jemima Simpers took, under the decree, such an estate as descended to her heirs.    If H. Simpers only took a life-estate under the will of T. Simpers, then all the remainders ingrafted upon it were contingent, and destroyed by the deed of 1814.    See *Luddington vs. Kime,* 1 *Ld. Ray.,* 203.    *Plunket vs Holmes,* 1 *Levinz,* 11.    Under the Act of 1782, chap. 23, any sort of conveyance has the force of a recovery.    By the deed of 1814, H. Simpers acquired a fee-simple, which, even if it were defeasable, would descend as long as it remained uncontroverted, and it passed to Jemima by the trustee's sale, and from her to her heirs, who held the same till 1837, making a period of twenty-three years, during which H. Simpers and those claiming under him held possession of the land; this gave them a right of entry, which would maintain this action.    H. Simpers, by the feoffment of 1814, destroyed

all the remainders, (they being contingent,) and took to himself a fee. The feoffment not only destroyed the remainders, but was a forfeiture of his life-estate, so that H. Simpers held a kind of fee which vested under the decree and sale in Jemima, and descended to her son and daughter, and after twenty years gave a right of entry; just in the same manner as if H. Simpers had disseized some one in 1814, had died 1820, the land had been sold to pay debts in 1821, Jemima had purchased, and died in 1826, and her children had held till 1837.

It is also contended, that the decree and sale passed the title of Thomas H. Simpers to the same effect as if he had conveyed himself. The Act of 1782, embraces all kinds of conveyances, and in *Johnson vs. Cresswell*, decided by this court about twenty years ago, but not reported, it was determined that a decree *pro confesso*, without appearance, barred an estate tail; a decree binds all the parties, and sells, when a sale is ordered, the rights of all the parties. T. H. Simpers could not have claimed against this decree, nor could his son have claimed against it, because it sold all the right of T. H. Simpers, which was, in this view of the case, an estate in tail, and if it sold his estate tail it barred the issue in tail, and if the issue in tail was barred it barred all remainders beyond, and converted the estate into a fee, and gave Jemima an estate which descended to the plaintiff. Thomas H. Simpers having lived till he was twenty-eight years of age, and held the land as heir of his mother, the decree would have the same effect as if he had been of full age when it was rendered.

It is so clear, however, that Henry Simpers took an estate in tail male, that no further time will be used in discussing the other questions. It seems to us, that unless the landmarks of the law, in these days of progress, are to be overlooked, no rational interpretation can be given to the will of Thomas Simpers, except the one we contend for.

The various reasons given in the books for the rule in *Shelley's case*, we shall not advert to; no doubt the principal reason was to unfetter the lands, the same which prohibits

perpetuities, which induced the barring of estates tail by a ficticious recovery, and which established the rule, that nothing should be an executory devise if it could be construed as a remainder. To untrammel estates was an important object, for such is the disposition of men to direct the future use of their lands, that former owners, unrestrained by the law, would have scarcely left a tract in the State unencumbered with limitations: which would have debarred all sales and prevented all improvements.

The case of *Chelton vs. Henderson*, 9 *Gill*, 432, seems to be opposed to the whole current of previous decisions, both in this State and in England; no authority is cited by the judge for his opinion, but a Virginia case, that cannot be regarded as binding here. Virginia has a system of land laws of her own, to which our courts have not been in the habit of looking for rules of interpretation. The English common law, as settled in Westminster Hall, at the time of the framing of our Constitution, was adopted as our law. It had been the law of the Province before, and our land titles, whether held under deeds or wills, before or since, (except where the law is changed by the Legislature,) are held under this law. Would it be safe to change it on a decision of a Virginia court, which professes to be based on their Acts of Assembly ?

It is true, Judge Dorsey thinks, the Acts of 1782 and 1786 have altered the rules for interpreting wills. We ask, do those acts furnish any reason to support his decision ? The first manifestly only gives a new mode of docking entails, and does not, in any manner, interfere with the mode by which entails are created. It has never been supposed to furnish a new rule for interpreting wills.

The reasoning, too, from the Act of 1786, to show the intention of the testator in that case, is not satisfactory. In the first place, when the will was made the Act had been but a few months in operation, and it is not probable that Isaac Dixon knew anything about it. He certainly did not know that it abolished fee tails general, as will be seen by the face of the will.

Now the Act of 1786 may, by making all estates tail gene-ral, fee-simple, in some cases, so far affect the interpretation of wills. But as that Act does not affect estates in tail male it cannot affect the decision of this case. This case must be decided on English law; we have no statute that affects it.

To show that the rule in *Shelley's case* was always a rule of law here, we refer to the opinion of Judge Walter Dorsey in the case of *Horne vs. Lyeth*, 4 *H. & J.*, 431. He was a very learned judge, and the case was argued by Martin and Pinkney.

The rule in *Shelley's case* is not a mere rule of construc-tion, it is an inflexible rule of law. Whenever it is ascer-tained that the testator meant to give to the heirs, general or special of the devisee, for life, an estate of inheritance, then the rule applies; not to effectuate the intention of the testator, but generally, if not always, to defeat it. The rule does not interpret a will. The meaning is to be collected from its words, and after the construction is fixed, then the rule de-termines the quality of interest given to the first devisee. 2 *Jarman on Wills*, 242.

*Jas. T. McCullough* for the appellee.

The judgment to be rendered in this case mainly depends upon the question: What estate did Henry Simpers take under the will of his father, Thomas Simpers? If he took a life-estate only, then the judgment of the circuit court must be af-firmed, as the deeds between Henry Simpers and Kilgore, made for the purpose of barring the supposed estate tail in Henry Simpers, are void for the purpose intended, and all the proceedings in equity, for the sale of Henry Simpers' pro-perty, for the payment of his debts, are vain and nugatory, in-asmuch as there was no title or estate to be sold, the life in-terest which he held under his father's will having terminated with his own life, and the property having vested, at his de-cease, in Thomas H. Simpers, his son, as a purchaser under the same will.

The appellant contends that, although the positive lan-guage o the will is, "I give and devise unto my natural son,

Henry Simpers, all my present dwelling-plantation," &c., &c., "*for and during his natural life,* and after his decease to his eldest son," &c., &c., such intention of the testator, to confer a life-estate only upon Henry Simpers, cannot prevail by reason of the application of the rule in *Shelley's case.* It is not denied, that the first part of the devise to Henry Simpers merely confers a life-estate, taken by itself, but on account of words contained in the latter part of the devise, it is held by the appellant, that the rule in *Shelley's case* applies, and the estate of Henry Simpers is enlarged to an estate tail.

"The right of testamentary disposition, where the intention of the testator satisfactorily appears, is to be favored and fully effectuated, unless its exercise be attempted in contravention of some established principle of law, over which the intention of the testator can exert no control." *Chelton vs. Henderson,* 9 *Gill,* 432. The intention of the testator must be gathered from the whole instrument. By reference to the will it will be seen, that in each devise to his several sons, it was his intent to confer upon each a life-estate only, and to make the eldest son of each the stock from which should begin the estate in special tail male. This intention appears in the first part of the devise to Henry Simpers. Does the latter part conflict with this intent expressed in the first part of the same devise? The words are as follows: "But if my son, Henry Simpers, should have a son as aforesaid, and such son should die without issue male, in that case it is my will and intention, that if the said Henry should have a second son, or any heir male of his body, lawfully begotten, that such son or heir male should have the aforesaid property, &c., &c., to him and his eldest son male forever; it being my will, that the said property should pass from my said son, Henry Simpers, to his eldest son and heir of his body, lawfully begotten, and so on, from generation to generation, forever." These words were evidently intended to explain the first part of the devise to Henry Simpers, and must be construed with it. They show merely the desire of the testator, that the first and other sons of Henry Simpers should have the estate tail before the life-estate of William should vest.

The intention is not at variance with the first part of the devise. Construed together, they mean simply, that Henry should have a life-estate in the property, that next an estate tail should vest in his eldest son, if he died without issue male, then the estate tail should vest in the other sons successively, and should all of Henry Simpers' sons die without issue male, then the life-estate of William should vest. There is no rule of law to prevent such an intention from being carried out, if it sufficiently appears that such was his intention.

The words, "that the property should pass from Henry to his eldest son and heir of *his* body," are relied upon to bring the devise to Henry within the rule in *Shelley's case.* It will be observed, that the word "heir" is used, not "heirs;" and if the testator meant the "heir" of Henry Simpers, it was but a repetition, as he had just used the word "son." The words "son" and "heir" meaning the same thing, and being qualified by the words following, "and so on," &c., &c. The proper construction, however, would seem to be, to refer the words, "heir of his body" to the word "son," it being the first antecedent before "his " This is correct upon the principles of grammatical construction, and accords with the general intent of the testator, as shown by other portions of the will.

Because the testator has used the expression, "and so on, from generation to generation, forever," it is held by the other side, that he intended to create a perpetuity, and, therefore, the devise over to the sons is void. The design of the testator, as shown by other portions of the will, was to give to Henry a life-estate, and afterwards to limit the estate, in special tail male, to his eldest and other sons. The words, "and so on," &c., have reference to this mode of descent provided for in the will. If the rule in *Shelley's case* has any application, it is to give the eldest son, in whom the property should vest, an estate tail, and not a life-estate, according to the words in the first part of the devise to Henry. The expression, "and so on," &c., so far as they may have been intended to create a perpetuity, are void, the sons being en-

titled, successively, to an estate tail, though the testator may have wrongly supposed it (the estate tail) would be inalienable. See *Adams vs. Cruft*, 14 *Pick.*, 23, 24.

The rule in *Shelley's case* was adopted in England, as a part of a settled policy, in all cases, to favor title by descent in preference to title by purchase. It had its origin in feudal times, and was, perhaps, influenced by considerations which have long ceased to exist. 2 *How.*, 43.. Under the feudal tenures, all the advantages to the lord, such as wardship, marriage, &c., accrued when the title passed by descent. In this State, since the Act of 1786, ch. 45, by which the right of primogeniture was abolished, all presumptions and preferences, in favor of the title by descent, are done away. *Chelton vs. Henderson*, 9 *Gill*, 432. The rule in *Shelley's case* cannot, at this day, be invoked for the purpose of negativing the express intent of the testator. That intention must prevail, unless some absolute rule of law is infringed upon. In England and this country, the rule has not generally been applied, except when the words of inheritance have been "heirs" or "heirs of the body" *eo nomine*. It does not apply in a deed or devise, where the words are "sons," "children," "issue," "lawful issue," these last being generally construed to be words of purchase. See 1 *Hilliard on Real Property*, 643, 650; also *Lyles vs. Digges*, 6 *H. & J.*, 364.

"Where there is a limitation to an individual or individuals of the family of the first taker, as to a son, sons or children, with superadded words of limitation to his or their heirs in fee, or in tail, such selection being a manifestation of the testator's intention, to constitute the person or persons selected, a stock from which the inheritance shall be deduced, there can be no doubt, that the ancestor referred to will take an estate for life only, notwithstanding the person or persons so selected may also fill the character of heir or heirs to such ancestor." *Lyles vs. Digges*, 6 *H. & J.*, 364. In this case the limitation is to an individual or individuals of the family of the first taker, Henry Simpers, that is to say, to his eldest son, or in case of the eldest son's death, without issue male, then to a second or other son; and there are superadded words

of limitation to the heirs male of the said sons.    Such selection, therefore, manifests an intention, on the part of the testator, to constitute the sons of Henry Simpers, successively, a stock from which the inheritance shall be deduced; and there can, as a consequence, be no doubt, that Henry Simpers did take under the will, according to the intention of the testator, a life-estate only, notwithstanding the son or sons, selected as aforesaid, may have also filled the character of his heirs male.    The case of *Lyles vs. Digges* has many points of resemblance to this case, and the opinion of the court, in that case, is relied upon as authority to show, that Henry Simpers took only a life-estate.    The case of *Chelton vs. Henderson,* heretofore referred to, is also relied upon.    See also *Shriver's Lessee vs. Lynn,* 2 *How.,* 43.

It is also contended, as a ground upon which the appellant hopes to recover, that Jemima Simpers took, under the decree, such an estate as descended to her heirs.    That the effect of Henry Simpers' deed to Kilgore, and of Kilgore's deed back to Henry Simpers, was to destroy the estate tail of his son, with the other remainders, and vest in Henry a fee-simple.    This position seems to involve doctrines new in Maryland.    Whatever may have been the effect of a common recovery in England, in this country; as a form of conveyance to bar an estate tail or estates in remainder, no such effect has ever been attributed to the Act of 1782, ch. 23, as would authorize a deed of bargain and sale, made by the tenant for life, to pass the entire fee-simple, and thus defeat any remainders for life or in tail.    The Act of 1782, authorizes *one seized of an estate tail* to convey by the same form of a conveyance which it is lawful to use to convey a fee-simple, and the effect of such a deed, by the tenant in tail, is to vest a fee-simple estate in the grantee.    No power, however, can be claimed under the Act, to authorize a tenant for life to convey an estate not vested in him.

It is also said, that the effect of the deeds between Henry Simpers and Kilgore, in 1814, was a disseizin of Thomas H. Simpers', the son's, estate, and that Henry, by the disseizin, acquired such an estate as could legally be sold for the pay-

ment of his debts under the decree. It is also contended, that the decree and sale passed the title of Thomas H. Simpers, and that the effect of the decree and sale to Jemima was, to bar his estate tail. If Thomas H. Simpers was disseized in the manner contended for by the appellant, it is also true, that he afterwards came back into possession, under his mother, Jemima, and being restored to the possession, he would be construed to be in by title as tenant in tail. It is only necessary to refer to the doctrine of *remittitur.* *Coke Litt.,* 347, *b.* 3 *Bl. Com.,* 19.

The Act of 1785, ch. 72, authorizes the real estate, of which any one dies seized, to be sold for the payment of his debts. If Henry Simpers only had a life-estate, he was not seized of such an estate as could be sold after his death, and the fact that Thomas H. Simpers, the son, was summoned regularly and answered by his guardian, gave the court no power to sell his property for his father's debts. It is not to be supposed, that our courts of equity would, for one moment, tolerate the idea, that the property of infants could be disposed of for the payment of the debts of others.

The appellant, however, seems not to rely upon these points, but rather to place his dependence on the construction of the will of Thomas Simpers, that Henry Simpers took an estate in tail male, which was barred by the deeds in 1814, and that in consequence thereof, the sale for the payment of debts, under the decree, passed the estate to Jemima, from whom it passed to Thomas H. Simpers and the appellant, who, upon the death of Thomas H. Simpers, became entitled to the whole estate.

The cases before referred to, we think, are sufficient to show, that no such construction can prevail in Maryland, nor should our courts, at this day, be called upon to overrule the cases of *Lyles vs. Digges* and *Chelton vs. Henderson,* for any reason which has or can be assigned on the part of the appellant.

*E. F. Chambers* on the same side:

The second point of the appellant, in reference to the effect

of the decree, is submitted upon the argument made by my colleague, and I shall not exhaust time in its discussion.

The pith of the argument on the other side, on the first and main point in the case, is, that the rule in *Shelley's case* is a fixed principle of the law, and must regulate the transmission of real estate *without reference to the intention of the testator*. On this point I take issue, and say, that the rule in *Shelley's case* is *subservient* to the great object of arriving at that *intent*, and will not be enforced against the *obvious* and *plainly declared* purpose of the testator.

The argument of my colleague I commend to the special attention of the court, and, with him, I say, this court, before it can reverse this judgment, must overrule the cases of *Lyles vs. Digges* and *Chelton vs. Henderson*. The will of Thomas Simpers comes exactly up to the decision in *Lyles vs. Digges*. He gives the property to his son, Henry Simpers, *for life*, then to *his* eldest son for life, and to his issue male, and in default of such issue to the second son, or any heir male, of the said Henry, lawfully begotten, to him and to his eldest heir male forever, "it being my will that the said property should pass from my said son, Henry Simpers, to his eldest son and heir of his body, lawfully begotten, and so on, from generation to generation, forever, and *in default of such issue* to my son William and his eldest son, as aforesaid." He thus makes the *sons* of Henry a *stock* from which the inheritance shall be deduced; they are *selected*, and the limitation is to them, with superadded words of limitation to their heirs in tail, and in such a case the court, in *Lyles vs. Digges*, say the ancestor (in this case, Henry Simpers) takes an estate for life only, *notwithstanding* the person or persons so selected may also fill the character of heir or heirs to such ancestor.

Another thing to be considered in reference to this will is, that the testator made it with a perfect knowledge of the condition of his sons; they were his natural children, and he knew they had no inheritable blood *inter se*, and the will was made with special reference to this fact. He designed to make the limitations in *strict settlement* upon his first and other sons. This knowledge of the condition of his children,

Simpers' lessee *vs.* Simpers.

is a circumstance to be taken into consideration in the construction of his will, in order to arrive at his *intentions.*

But even according to the English decisions, this will does not come within the rule in *Shelley's case.* There is a whole class of cases where a testator, having plainly declared his intention to vest a life estate in the first taker, and then to his sons in succession, *exhausting* and *completing* the *line of issue,* within the range of the intention indicated by a particular devise, the rule in *Shelley's case* will not apply, and, in such cases, the limitation over in *default of such issue,* will not enlarge the meaning of the previous limitation. Where, in the enumeration of the lines of issue, the entire number of the same class which the particular limitations indicate an intention of selecting, *is left incomplete,* there the general language of the limitation over has been laid hold of as indicating the general intention to include all of the class, and as controlling the particular limitations to a particular number, that is, the rule in *Shelley's case* comes in *in aid* of the intent of the testator. But where *complete* provision is made for all the members of the particular lines of issue which the antecedent limitations, of themselves, indicate an intention to provide for, the enlarged construction of the limitation over is not given; for, in using general language, the testator is not, of necessity, to be supposed as intending to do more by *implication* than he had actually done by the express words he had used, and the express limitations being sufficient to include all the class of which express mention is made, they do not, of themselves, supply any ground for supposing the intention to have been more extensive, and, in the absence of any such evidence of intention to be deduced from the limitations, there is no foundation for giving a more enlarged meaning to the words of limitation over. In other words, in both classes of cases, the intention is deduced, not from the words of the *limitation over,* but from those of the prior *limitations;* in the one case, from their *imperfection* to accomplish what they show to have been the particular intent, in the other, from their being *adequate* and *sufficient* for that purpose.

These views are fully sustained by the case of *Baker vs. Tucker*, 2 *Eng. Law & Eq. Rep.*, 1, where the testator devised real estate to his illegitimate son, John Baker, for life, and, from and after the decease of the said John Baker, for and to the first and every other son of the said John Baker, lawfully issuing, according to seniority of age and priority of birth, in tail male; and, in *default of such issue*, to the daughter or daughters of the said John Baker, to hold to them, if more than one, and their heirs as tenants in common, and not as joint tenants; and, *in default of issue* of the said John Baker, to and for the testator's own right heirs forever. It was held that John Baker took an estate *for life only* under this will. The judgment in that case was pronounced by *Sir Edward Sugden*, and was affirmed on appeal to the House of Lords. In the present case, the whole line of issue which the testator *intended to be objects of his bounty*, was exhausted and completed by the particular limitation in question. *All* the sons of Henry Simpers and *their heirs male* are to take before the limitation over to William Simpers can operate, and there is nothing in the will from which an intent can be deduced that he wishes his *female grand-children* ever to have any portion of his estate in any event.

The same doctrine held in *Baker vs. Tucker*, is announced in the case of *Chamberlayne vs. Chamberlayne*, 34 *Eng. Law & Eq. Rep.*, 207, and same case in 37 *Eng. Law & Eq. Rep.*, 54. Such are the English decisions.

The American authorities treat the rule in *Shelley's case* with less favor. The case of *Chelton vs. Henderson* is conclusive of what the law in Maryland is, and was a much stronger case for the application of the rule than the present. That case has been recognized in the case of *Tongue's lessee vs. Nutwell*, 13 *Md. Rep.*, 415, where the court say: "The rule in *Shelley's case* has been long recognized and adhered to, both in England and in this country, and we do not mean to deny or disregard its authority; nor do we understand the decision in *Chelton vs. Henderson*, as designed to exclude the operation of that rule in the interpretation of a will to any

greater extent than to hold that, where the *intention* of the testator to create no larger estate in the first devisee than for life, is *clearly expressed by the will, such intention must prevail.*'' For other American cases see, 13 *Metcalf*, 389, *Canedy vs. Haskins.* 8 *Georgia Rep.*, 146, *Benton vs. Patterson, et. al.* 10 *B. Monroe*, 104, *Jarvis, et. al., vs. Quigley, et. al.*

*Otho Scott*, for the appellant, in reply:

The rule in *Shelley's case* is in full force in Maryland, and came here, as it was understood, at the time of the Revolution. When the convention adopted the common law, they adopted this rule as a part of it; and it has regulated the title to real estate ever since.

This rule, where it applies, controls a devise without reference to the intention of the testator. In many cases the devise has been to the first taker for life, and no longer. In fact, it always contravenes the intention of the testator, because it gives an estate of inheritance where the testator only intended to give an estate for life. This rule, too, has always been applied where the limitation to the issue, or heirs, comprehended all the persons who would take in succession, and no more, if the devise had been in form, a devise in tail or in fee. And a testator could not defeat the application of the rule by any form of words, provided these words, in their plain meaning, showed, that the estate was to go to a class of persons, and that this class of persons were either heirs general or special. For example: "a devise to A. for life, and, after his death, to such persons as would inherit the same if an estate in tail male, had been given by this will to A;" such a devise would be clearly within the rule, and would give A. an estate in tail male.

Where there are two intents, a general and particular intent manifested, the former must prevail. In this case, if Thomas Simpers designed, as his particular intent, to give Henry Simpers a life-estate, and a life-estate to his eldest son, as expressed in the first part of the devise, his general intent, as expressed in the latter part of the devise, was, that the male issue of Henry Simpers, to the end of time, should

inherit.  The words of the will are, "if H. Simpers should have a second son or any *male heirs*," &c., and again, "it being my will that the said property should pass from my said son Henry to his eldest son and heir of his body," and so on, &c.; "and in default of *such* issue," &c.  "In default of such issue," must mean, taken with the context, in default of male issue, and this of itself would give Henry an estate in tail male by implication.  The testator intended the property to go to *any* heir male of Henry.

There is no case like this to which the rule in *Shelley's case* has been held not to apply, and I refer to the authorities mentioned in our opening argument.  All the authorities are collected, and ably commented upen, in *Jarman on Wills,* ch. 37, where a more satisfactory view of them can be had than by looking at isolated cases.

The will in this case, as in all others, must be construed by itself.  We must ascertain the meaning by taking the whole will together, and doing so, it seems manifest, that the testator designed to give an estate tail male to Henry, and that he did not intend the limitation over to William to take effect till there was a failure of male issue on the part of Henry.  The devise to William evidently gives him an estate tail male, by implication; the will says, if my son William dies "*without issue male*," &c.  Why should the testator give an estate tail to William, and an estate for life, only, to Henry?

I shall not comment, at large, on the case of *Chelton vs. Henderson*, or the case of *Tucker vs. Baker.*  They both differ materially from this.  The first, too, is very unsatisfactory.  It gives no authority but the *dictum* of a Virginia judge, where the rule in *Shelley's case* has for many years been so trenched upon, that, in their new code, they abolished it; or rather, adopted a rule, as founded on former decisions, inconsistent with it.  And the reasons in *Chelton vs. Henderson* are not convincing.  If the reasons of the court, in that case, are right, it would be easy to argue from them, that the rule in *Shelley's case* was abolished in Maryland.

The case of *Baker vs. Tucker,* only resembles this case in this, that the devise in both cases was to illegitimate children,

and this circumstance is adverted to, but for what reason is not perceptible. The same construction must be given to a devise to an illegitimate as if he were not. How can it vary it? An illegitimate, it is true, could not have any collateral heirs, but a devisee might not have any collateral heirs, if he were not illegitimate. Then what difference can there be in a devise to an illegitimate, and a devise to a legitimate who has no collateral relations? The judge, in *Baker vs. Tucker,* might have felt there was some weight in it, in a controversy between the wife of the illegitimate and the heir at law of the testator. In this case, however, the fact, that Henry Simpers was illegitimate, cannot, by possibility, make any difference. The devise to him was in tail, and an illegitimate can have as many heirs in tail, and is as likely to have them, as if he were legitimate. There is no limitations in fee that could go to collaterals. But all the limitations are in tail, and all to illegitimates. This is a controvery between illegitimates. There is no limitation, in this case, to the testator's own right heirs, as in *Baker vs. Tucker,* and there is no guessing about who were the objects of the testator's bounty; it is manifest, that the natural children of Simpers were the only objects of his bounty.

The case of *Baker vs. Tucker* is a limitation to all the sons, in tail male, with remainder to the daughters in fee, and differs widely from this case. The case of *Lyles vs. Digges* is a limitation to *all* the sons, and this distinguishes it from the case of *Langley vs. Baldwin,* and the *Attorney General vs. Sutton,* cited by the court in *Lyles vs. Digges,* 6 *H. & J.,* 374. The limitation in *Lyles vs. Digges* being to all the sons forms the turning point in the case. If the limitation had been to some of the sons, and a limitation over, as in Digges' will, the rule in *Shelley's case* would have applied.

In this case but two of the sons are mentioned, although it is clear, that the testator meant, that any son that Henry Simpers might have should take, and this makes it like the cases referred to, where only some of the sons are mentioned, and varies it from the case of *Lyles us. Digges* and *Baker vs.*

*Tucker.* The limitation over after a failure of such issue, and all the sons are mentioned, refers to the issue of such sons. But in this case, as all the sons are not mentioned, the limitation over must be after a failure of heirs male on the part of Henry, which would give him an estate tail.

If none of the sons were mentioned and the limitation over was after a failure of heirs male, it would be clearly within the rule, or an estate in tail male by implication, because in that case the limitation would be to a class of persons described as heirs special. So if a part of the sons are mentioned, and the limitation over is after a failure of heirs male, the rule would apply, because the limitation is not only to part of the sons, but embraces all the persons not mentioned who could be heirs male. But where all the sons are mentioned the limitation over is after a failure of issue of the sons, and there is no general term used which embraces other persons than those enumerated and their issue, and this distinction is established by the cases referred to, and is recognized by the court in *Lyles vs. Digges.*

I decline arguing the second point, about the effect of the decree because Thomas H. Simpers was an infant. A decree, as a general rule, passes the title to all persons parties to it. If T. H. Simpers had been of full age he clearly could not have controverted the title of any person under the decree. Can he do so after a lapse of seven years, after he comes of age? An infant is as much bound by a decree as a person of full age, if he does not file his bill of review in a reasonable time after he comes of age, and less than seven years is a reasonable time. Thirty years have elapsed and the decree has not been impeached.

I have not referred to cases decided in other States, because some of them have varied the rule in *Shelley's case,* and some of them, Massachusetts and Virginia for example, have abolished that time-honored rule. I contend for the rule as it was brought here, and as it was understood by the profession in Maryland, for in that sense it widely affects the land titles in this State, and any new modification of the rule would tend to uncertainty, and unsettle the law of real property.

Simpers' lessee *vs.* Simpers.

BARTOL, J., delivered the opinion of this court:

The main question presented by this appeal, and the only one which it is necessary for this court to consider, is, what estate did Henry Simpers take in the lands devised to him by the will of his father, Thomas Simpers, the elder? That devise is as follows:

"I give and devise unto my natural son, Henry Simpers, son of Mary Bouldin, all my present dwelling plantation, &c., &c., to him the said Henry Simpers (son of Mary Bouldin) for and during the term of his natural life; and after his decease, to his eldest son; for and during the term of the natural life of such eldest son; and in default of such issue on the part of the said Henry, I give, devise and bequeath the property real and personal aforesaid, hereby given to the said Henry, unto my natural son, William Simpers, (son of Mary Bouldin,) for and during the term of his natural life, and after his death, to his eldest son, for and during the term of the natural life of such son, and after the death of such eldest son, to the eldest son of such son, and his issue male, of his body, lawfully begotten, forever; but if my said natural son Henry Simpers (son of Mary Bouldin) shall have a son as aforesaid; and such son should die without issue male, in that case, it is my will and intention, that if the said Henry should have a second son, or any heir male of his body, lawfully begotten, that such son or heir male should have the aforesaid property, real and personal, to him and his eldest heir male, forever; it being my will, that the said property should pass from my said son Henry Simpers, to his eldest son and heir of his body, lawfully begotten, and so on, from generation to generation, forever; and in default of such issue to my son William and his eldest son, as aforesaid."

It is contended, on the part of the appellant, that this devise vested in Henry an estate tail male, by force of the rule in *Shelley's case*, while, on the part of the appellee, it is argued that this case is not within the rule; that the intention of the testator being plainly manifested, to give to Henry no greater estate than for life, such intention must prevail, and that Henry, the first devisee, took a life estate only.

24     v. 15

By the ruling in *Shelley's case,* the principle was established, "that if land be limited to a person for life, and after his decease to his heirs, or the heirs of his body; the remainder to his heirs or heirs of the body, is immediately executed in the ancestor, who becomes seized of an estate of inheritance."

This definition of the rule is sufficient for our present purpose; a more full and accurate definition of it, given by Mr. Preston, and adopted by Chancellor Kent, may be found cited in 3 *Md. Rep.,* 544.

Whatever may have been the origin of this rule, it is certain that it was firmly established in the jurisprudence of England before our Revolution, and was introduced into this State as a part of the common law; it has been recognised and enforced by our courts, and many valuable estates have been held under it in Maryland.

In the case of *Ware & others vs. Richardson,* 3 *Md. Rep.,* 545, this court in speaking of this subject declared, "that the rule with its qualifications must prevail as a part of our system of real law, because it has been fully recognised and adopted as the settled law of Maryland."

We did not understand the counsel for the appellee as denying the binding force of the rule; but as contending that this case falls within one of its recognised exceptions or qualifications. This brings us to an examination of the words of the will before us, for upon their interpretation must depend the solution of this question.

In the first part of the devise, the testator gives to Henry a life-estate, with remainder to the eldest son of Henry for life; and *in default of such issue,* on the part of Henry, to William (another son of the testator) for life, &c. If the will had stopped here, it is plain that Henry would have taken only a life-estate, and on his death without leaving his eldest son living, the land devised would go to William. That would be the effect of this clause of the will if; the words, "such issue," are to be construed as referring to the eldest son of Henry. But it is evident from the subsequent part of the will, that the testator did not intend William to take the land,

upon the event of Henry failing to leave his eldest son surviving him; his design was that any son of Henry, or any heir male of the body of Henry, should take before William should become entitled.   His words are: *"but if my said natural son Henry shall have a son as aforesaid, and such son should die without issue male, it is my intention, that if the said Henry should have a second son, or any heir male of his body, lawfully begotten, that such son, or heir male, should have the aforesaid property to him and his eldest heir male, forever*; it being my will that the said property should pass from my said son, Henry Simpers, to his eldest son, and heir of his body, lawfully begotten, and so on, from generation to generation, forever; and in default of such issue to my son William and his eldest son, as aforesaid."

Now, there is no rule better established than that, when there is a particular intent expressed in a will, and a general intent inconsistent therewith expressed in the same will, the latter must prevail.

Here the general intent is manifest, that all the heirs male of the body of Henry shall be entitled, before the devise over to William can take effect; this intent cannot be gratified, without vesting in Henry an estate tail male.   The particular intent to be found in the words, which give a life-estate to Henry, cannot control the manifest general intent of the testator; to give to them such effect, would be to repeal or disregard the established rules of interpretation.

In *Jones vs. Morgan*, 1 *Brown's Ch. Rep.*, 206, Lord Thurlow said, "that where the estate is so given, that it is to go to every person who can claim as heirs to the first taker; the word heirs must be a word of limitation; all heirs, taking as heirs, must take by descent."

In *Poole vs. Poole*, 3 *Bos. & Pull.*, 627, Lord Alvanley said, "that the courts will not deviate from the rule which gives an estate tail to the first taker, if the will contains a limitation to the heirs of his body, except where the intent of the testator appears so plainly to the contrary, that nobody can misunderstand it."

The same language was repeated, by Lord C. J. Tindal, in *Jack vs. Featherston*, 9 *Bligh*, *N. S.*, 237.

In the case of *Ware vs. Richardson*, 3 *Md. Rep.*, 544, this court said: "In cases, therefore, when the word 'heirs' or heirs of the body are used, they will be construed to limit or define the estate intended to be conveyed, and will not be treated as words of purchase; and no supposed intention on the part of the testator or grantor, arising from the estate being conveyed in the first instance for life, will be permitted to control their operation, as words of limitation.. In all such cases, the estate becomes immediately executed in the ancestor, who becomes seized of an estate of inheritance."

We do not mean to be understood that the use of the words *heirs of the body*, has, under all circumstances, this effect. They are susceptible of explanation and qualification, and if the context plainly shows that they were not used by the testator in their ordinary signification, but were designed to indicate another class of objects less extensive, such as *sons, children,* &c., there they would be construed so as to effectuate the intention of the testator. Many cases of this sort have arisen, and have been recognized as exceptions to the rule; but in the will before us, there are no such qualifying or explanatory words; by the terms, "*any heir male of his body,*" the testator did not mean to confine the bequest to the sons of Henry; there is nothing in the will to authorize such a restricted construction; on the contrary, it would defeat his intention; for by the plain import and intent of the will, the land could not go to William, except upon failure of heirs male of the body of Henry. This includes grandsons, as well as sons; and, indeed, embraces the whole line of male descendants of Henry. This is, therefore, not within that class of cases in which there is a selection of an individual or individuals of the family of the first taker, who are constituted a stock from which the inheritance is to be deduced, and who therefore take by purchase and not by descent. Nor is it like the case of *Lyles vs. Digges,* 6 *H. & J.*, 364, or the case of *Baker vs. Tucker*, 2 *Eng. Law & Eq. Rep.*, 1, which have been cited, and relied upon in the argument

by the counsel for the appellee. In each of those cases there was a devise for life, with a limitation in tail to the first and every other son of the first devisee, to take in succession according to seniority of age and priority of birth, and in default of such issue, over, and it was held that the first devisee took an estate for life only. The principle of the decision in *Baker vs. Tucker* is thus stated by Chancellor Sugden in his very able opinion pronounced in that case: "Where after the devise to the first taker, either generally or expressly for life, particular limitations are introduced, in favor of his issue, followed by a limitation on failure of issue of the same person; if these particular limitations exhaust the entire line of issue, in whose favor they are designed, without calling in any implication of a more general character, to be deduced from the language of the limitation over, that limitation is to be considered as implying nothing more than has been expressed by the particular limitations which precede it, because the intention which it indicates, has been already expressly and fully carried out." The learned Chancellor afterwards, in the same opinion, speaks of a class of cases, "where in the enumeration of the lines of issue, the entire number of the same class, which the particular limitations indicate an intention of selecting, is left incomplete, there the general language of the limitation over has been laid hold of, as indicating the general intention to include all of the class, and as controlling the particular limitations to a particular number," and cites as examples of this latter description of cases, *Langley vs. Baldwin*, 1 *Eq. Ca. Ab.*, 185, and *Attorney General vs. Sutton*, 1 *Peere, Wms.*, 753. These cases are somewhat analogous to the one before us, for in this will but two sons of Henry are mentioned in the enumeration of the persons selected, while the testator plainly expresses his intention, that any heir male of the body of Henry shall be capable of taking the estate, and the limitation over is "in default of such issue," which means, upon failure of heirs male of the body of Henry.

It is unnecessary to notice, at any great length, the decision in the case of *Chelton vs. Henderson's Lessee*, 9 *Gill*, 432,

cited in the argument, because it is wholly unlike the case before us. The will in that case gave to Isaac Dixon a life estate with a limitation in tail to the issue of his body, lawfully begotten, and in the event of Isaac dying without issue of his body, lawfully begotten, then over, and it was held that Isaac took only a life-estate.

Without adopting all the reasoning of the learned Chief Justice, who delivered the opinion of the court in that case, we may remark, that the construction of Dixon's will may be reconciled with antecedent decisions, and is not inconsistent with the principles expressed in this opinion. It is evident that the ruling of the court in that case turned upon the construction of the word *"issue,"* as used in the will. On page 436, Judge Dorsey says, "Even if in such a case in England, the technical import of the word 'heirs' should be regarded as conclusive evidence of the intent of the testator, that the rule should operate, and countervail all other expressions in the will indicating a contrary intent, yet it by no means thence follows, that the same principle must govern the case now under consideration, where the word 'heirs' has not been used. According to all the decisions in England, and in the United States, 'issue,' which is in the will before us, is a term of equivocal import, being either a word of limitation, or of purchase, meaning heirs of the body, or children, according to the intention of the testator deduced from the expressions contained in his will." English cases might be cited, tending to show that the will of Isaac Dixon would perhaps have received a different construction in Westminster Hall. But looking to the phraseology of the will, no violence was done to any settled rule of construction, by the adjudication of the Court of Appeals thereon. In that will there were words superadded to the word issue, sufficient to give to the issue the inheritance without enlarging the life-estate given to the first taker, and in such a case, there is authority for construing the word *issue* as a word of purchase. In *Cruise's Digest*, 6 *Vol.*, 3 *Am. Ed.*, *page* 375, *sec.* 48, it is said, that "when an estate is devised to a person for life, with remainder to his issue, with words of limitation superadd-

ed; the word *issue* will, in that case, be construed as a word of purchase." Upon that principle the judgment in *Chelton vs. Henderson,* may be supported, without infringing the rule in *Shelley's case.* The case before us is, however, wholly unlike that of *Chelton vs. Henderson,* and that adjudication cannot control the construction of the will now under consideration.

Being of opinion, for the reasons stated, that Henry Simpers took under the will an estate *in tail male,* in the lands in controversy in this case, the judgment will be reversed and a judgment rendered for the appellant.

> *Judgment reversed, and judgment for the*
>> *appellant for the premises described in the*
>>> *declaration and costs.*

(Decided March 15th, 1860.)

TUCK, J., delivered the following dissenting opinion:

Being of opinion that the will of Thomas Simpers shows that he intended his son Henry should take an estate for life, and no greater, in the lands devised to him, I am constrained to enter my dissent from the opinion and judgment in this case. There is no difference between the court and myself as to the principles of law governing such devises, generally, but I think that this devise is not within the rule in *Shelley's case.*

*Note by the Reporter.*—In the case of *Chelton vs. Henderson,* referred to in the above case, it appears that the following opinion was prepared by *Judge Magruder,* but not filed in the cause:

"The appellee brought this action of ejectment, and recovered a verdict and judgment in Somerset county court. A single exception, taken by the appellant in the course of the trial, presents the only question for our decision.

"It is admitted, that Isaac Dixon (the eldest) died, seized in fee of the lands in controversy, having, by his will, bearing date May 1788, devised the same to his son Isaac, 'except the part already devised' to the wife of the testator.

"What interest (an estate for life, or of inheritance?) was devised to the son?

"The devise is in these words:—'I give and bequeath to my son, Isaac Dixon, the use of the plantation whereon I now live, (except the part already disposed of) to him, the said Isaac, *during his natural life,* and, if it should please God, that the said Isaac should have issue, born of his body

lawfully begotten, then such issue, after the death of the said Isaac, to have the aforesaid devised premises, *in fee tail*, but if the said Isaac shall die without issue of his body, lawfully begotten, it is my will and desire that the above mentioned lands and premises, with all other rights and claims in any land whatever, shall descend to my son, Thomas Dixon, and his heirs, *in fee-simple.*'

"The intent of this testator may be easily collected from the words in which he has thought proper to express it. Indeed, it would be difficult not to understand correctly his meaning. It is manifestly his will, that Isaac, his son, should never have an estate of inheritance by virtue of this devise, and that no person should have the power of depriving his son Thomas of the fee-simple, unless, at the time of the death of his son Isaac, there was issue of the son Isaac to inherit the estate in tail. Indeed, so anxious does he appear not to be misunderstood, in regard to the interest which his son Isaac was to take under the will, that, instead of devising to him land *totidem verbis*, devises to him, for life, the use—the *usufructus*, or 'temporary right of using the thing without the ultimate property and full dominion of the substance.' 2 *Blk.*, 327.

"Now, it being 'the great rule to which all other rules must bend, that the intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law,' the next inquiry is, whether this devise be, in all respects, consistent therewith?

"Of the Act of 1786, ch. 45, we need not speak, because the question here is, what estate did Isaac, the son, take?

"It is true, the authorities tell us, that a man's last will and testament may manifest two different and inconsistent intents, and thus it sometimes becomes necessary to expunge some of the words of a will; that where there are two intents inconsistent with each other, that which is the primary must control that which is deemed the secondary intent. The case of *Smith vs. Bell*, 6 *Peters*, and that of *Robinson vs. Robinson*, 1 *Burr.*, furnish illustrations of this last rule. These cases, however, are not at all like the present. There is no *general* intent in the case before us, which requires a sacrifice of the *particular* intent, or an enlargement of the estate *for life*, given to the first devisee, into an estate of inheritance. There is here no 'manifest main intent,' to be collected from the will, which can only be gratified by giving to the first devisee a larger estate than an estate for life. It may be added, that a conversion of the estate for life, into an estate tail, instead of effectuating the testator's intent with regard to the issue, would defeat it. Our act of descents would at once make of the estate given to the son by the testator, and of the several estates intended to be given to others, but one estate in fee, and thus have made a tenant for life the owner of the fee-simple.

"'We are reminded, however, that the intention of a testator is not *always* to be gratified, and it is insisted that this is one of those cases in which, according to '*Preston on Estates*,' instead of seeking the intention of the parties, and aiming at its accomplishment, the law interferes, in some cases, with the presumable, and, in many instances, with the express intention; in other words, in dealing with the case now under consideration, we are to regard it as another *Shelley's case*, to be disposed of according to the rule which, it is thought, decided that case.

"The rule in *Shelley's case* is, that 'where the ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs, in fee or in tail, the heirs are words of limitation, and not words of purchase.'

"This so called *rule in Shelley's case* has given rise to a deal of litigation. In *Perrin vs. Blake*, *Burrows* says, the cases cited were many and difficult to reconcile, each side had a string of them. As many treatises, large and small, have been written upon this rule, in which may be found both 'strings' of them, it is deemed quite unnecessary, in disposing of this appeal, to prepare another digest of those cases.

"In deciding such cases, it is well to bear in mind the remark of Ch. J. Eyre, 1 *Bos. & Pull.*, 220: 'Technical rules are not to be relied on in

explaining the intention of testators, and yet cases of intention are much embarrassed by authorities.' The rule in *Shelley's case* can scarcely aid the appellee. Such expressions used in a deed would give to the first devisee only an estate for life. The word (issue,) in grants, is exclusively a word of purchase, and in devises of real estate often means children, and is then a word of purchase, though it may be used either as a word of purchase or of limitation. 4 *Kent,* 223.

"The rule, itself, relates to a gift or conveyance to the *heir* or *heirs of the body,* whereby a father may secure an estate to himself and deprive his children thereof. To prevent this, a late writer on wills, (*Lovelass,* 225) says: 'It is usual to limit the remainder, not to the heirs of the body, but to the son or sons, or children, so that they may take as purchasers.'

"The devise, in the case now before us, is to the issue, and this word is, to be sure, sometimes a word of limitation. A devise to a man and his issue, gives, in England, an estate tail, in Maryland, a fee-simple to the devisee. A devise to a man during his life, and after his death to his issue, *if there be no words superadded,* will receive the same construction; because *if the issue,* in such a case, be made a word of purchase, then the issue would take but an estate for life, and thus the general and paramount intent of the testator, to give to the issue an estate of inheritance, would be defeated.

"In the case now to be decided, there are words superadded to the word issue, quite sufficient to give to them the inheritance; and the law is that: 'where an estate is devised to a person for life, with remainder to his *issue,* with words of limitation superadded, the word issue will, in that case, be construed to be a word of purchase.' See 6 *Cruises' Digest,* 1*st Am. Ed.,* 356, *sec.* 52, and the authorities there collected.

"It has always been, and is still, understood to be law, as was stated in 1 *Burr.,* 41, that where the issue cannot take an estate tail without taking it *through* the father, the father shall have an estate tail—*otherwise, not.*

"The opinion being entertained, that Isaac, the son, and first devisee, took only an estate for life, it follows that this judgment ought to be reversed. The conveyance of the fee, by Isaac, the son, to Isaac Dixon, the 3rd, is an essential link in the chain of the title of the plaintiff below. All the interest which the grantor could convey, was determined by his death, which, it is admitted, took place about the year 1823. As the plaintiff below can claim, now, nothing under the deed, there is now no title to be asserted in this action."