JOHN W. CLARKE vs. ALGERNON SMITH, Administrator of ROBERT D. WILLIAMS, and others.

*Construction of a Devise to one during the term of his natural life and no longer, and after his death, to his heirs lawfully begotten, forever, to be equally divided between them—Specific enforcement of a Contract.*

The will of a testator contained the following clause: "I give and bequeath unto my son R. D. W. the farm I purchased of W. A. D. containing one hundred and fifty acres more or less, and also the farm where C. W. now lives containing two hundred and two acres more or less, during the term of his natural life, *and no longer*, and after the death of my said son, I give and devise the said farm *to his heirs lawfully begotten*, forever, to be equally divided between them; but should my said son R. desire to sell the farm whereon C. W. now resides, I hereby authorize and empower him so to do, and also to convey the said land in fee to the purchaser or purchasers." R. D. W. afterwards sold the farm which by the will he was authorized to sell, to C. and being at the time largely indebted by judgments and otherwise, he obligated himself by a written contract to relieve the farm sold to C. of all liens created by his debts, and charge such liens exclusively upon the other farm devised to him. R. D. W. afterwards died. Upon a bill filed against his administrator, widow and children, to have said contract specifically performed, it was HELD:

1st. That the said devise might be read as being to the first devisee for life and no longer, and after his death to the heirs of his body lawfully begotten.

2nd. That the words *during the term of his natural life, and no longer,* did not restrict the devise to R. D. W. to a life estate.

3rd. That the terms *to be equally divided between them* had no such effect as to restrain the operation of the words *heirs of the body* and convert them into words of purchase.

4th. That the power of sale expressly given to the son could have no such controlling influence as to prevent the remainder to his heirs from becoming an executed estate in him.

5th. That none of the circumstances relied on by the appellees, considered either separately or all combined, sufficiently indicated a plain and unequivocal intention of the testator to use the words *heirs lawfully begotten*, in the sense of children, rather than in their strict technical sense.

6th. That R. D. W. took an estate tail general under the devise to him, and that estate, by operation of the statute to direct descents, was converted into a fee simple estate, and as such was liable to his debts.

7th. That there appeared no good reason why the contract referred to in the bill should not be specifically enforced as against the land that was agreed to be charged, to the exoneration of the land sold to the complainant

APPEAL from the Circuit Court for Caroline County, in Equity.

The contents of the will of the testator in this case, as far as material, are stated in the opinion of the Court. The appellant filed his bill against the administrator, and the widow, and children of the devisee, Robert D. Williams, setting forth the third clause of the will, and charging among other things, that on the 27th day of May, 1873, the said Robert D. Williams contracted to and with the complainant to sell and convey to him the aforesaid tract or parcel of land called " The Wayman Farm," containing 202 acres, at and for the sum of thirty-five hundred dollars; that in and by said contract it was stipulated and agreed, that the said sum of thirty-five hundred dollars was to be applied to judgments and executions of record

in the Circuit-Court for Caroline County, and in the officers' hands, and binding against said Williams; that said judgments and executions were, by the terms of said contract, to be assigned to the use of the complainant as a matter of security against all contingent errors and troubles, or loss; that the said Robert D. Williams was to give complainant a free and clear title to said farm, executed by himself and wife, and was to make by agreement in said deed, the farm he now owns and lives on responsible for all such debts as would in any way be a lien on the said tract or parcel of land called " The Wayman Farm ;" that the said contract was duly assented to by Ann M. Williams, wife of the said Robert D. Williams; and that on the 7th day of June, 1873, the said Robert D. Williams and Ann M., his wife, executed to the complainant a conveyance of the said tract or parcel of land called "The Wayman Farm."

The bill further contained a detailed statement of the judgment and mortgage debts of said Robert D. Williams, and alleged the death of said Robert, and that the complainant had paid of said judgments more than the amount of the purchase money to be paid by him for the "Wayman Farm," and had taken an assignment to himself of the judgments so paid; and that the personal estate of said Robert was insufficient to pay his debts; that a part of the "Wm. A. Dick farm " had been sold by a trustee to pay the deficiency in the personal estate; and that complainant was advised that under and by virtue of the last will and testament of the said William Williams, deceased, the said Robert D. Williams took an estate in fee simple in the said " Wm. A. Dick farm," containing 140 acres, as well as in the afore-named tract of land called the " Wayman Farm," in the third item in said will mentioned; and that complainant was entitled to have the said contract specifically performed, and to be reimbursed for the money paid out by him in excess of the purchase money of the " Wayman Farm,"

by a sale of the residue of the said "Wm. A. Dick Farm," according to the priority of the judgments paid by him; and prayed that the said contract might be decreed to be specifically performed, and that the residue of the said farm called the "Wm. A. Dick Farm," might be sold, and the proceeds applied to the payment of complainant's claims according to their legal priority.

The defendants demurred to the bill as presenting no case which entitled the complainant to relief, and the Court, (STUMP, J.,) under an agreement of the parties passed a *pro forma* decree ruling the demurrer good and dismissing the bill with costs to the respondents. The complainant appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, ALVEY and ROBINSON, J., for the appellees and submitted for the appellant.

*George M. Russum, John B. Brown* and *Edwin H. Brown,* for the appellant.

Two questions are presented by the demurrer: (1.) Whether the farm described in the third item of the will of William Williams, as the farm he "purchased of William A. Dick," is liable for the money paid by complainant, "to the judgments and executions of record and in officers' hands," in excess of the purchase money mentioned in the contract between the complainant and Robert D. Williams, deceased? and if so, (2.) Whether that liability can be enforced in equity?

The determination of the first question is dependent on the ascertainment of the nature of the estate vested in Robert D. Williams under the will of his father, William Williams. The exemption of this land from liability, can be affirmed only on the theory that he took an estate for life, with remainder to his *children,* as purchasers in fee. The devise in question is clearly within the rule in *Shelley's*

*Case,* and that he took an absolute fee. The rule is, "when a person takes an estate of freehold, legally or equitably, under a deed, will or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs or heirs of his body, as a class of persons to take in possession from generation to generation, the limitation to the heirs entitles the ancestor to the whole." 1 *Preston on Estates,* 263 ; 4 *Kent Com.,* 215, *marg.*

The words "*to be equally divided between them,*" are not referred to or relied on by the appellees in their brief, as indicative of any intention at variance with, or incompatible with the rule in *Shelley's Case,* and very properly, for they indicate or point out no mode of division, distribution or descent, inconsistent or at variance with the canons of descent which prevail in the State of Maryland. This provision or expression is perfectly consistent with our canons of descent.. *Fulton, et al. vs. Harman, et al.,* 44 *Md.,* 263.

The words "*and after the death of my said son,*" can have no controlling influence in determining the intent, for these words would be equally applicable whether the heirs were to take by descent or purchase. It is a known principle of law, that a man can have no heirs until after his death. An estate of freehold having been given to the first taker, as a matter of course during his life, his heirs could take nothing whether they were to take as heirs by descent or as purchasers. These words, therefore, can have or possess no positive or determining qualities adverse to the rule in *Shelley's Case. Keys & Heron vs. Goldsborough,* 2 *H. & J.,* 369.

The only remaining matter for consideration, is that portion of the clause in question, which reads : "But should my said son, Robert, desire to sell the farm where Charles Wayman now resides, I hereby authorize and empower him

so to do, and also to convey the said land in fee to the purchaser or purchasers." It is claimed that this provision indicates an overruling and controlling intent or purpose, to limit the estate of Robert to an estate for life in the "Dick Farm."

Now in a case like this, the question is, not so much as to the estate it was intended the first taker should take, as it is, as to how the heirs or persons in remainder should take, *whether by succession or descent, or as purchasers.* There is, no doubt, a particular intent that Robert should take a life estate ; the words, "during his natural life, and no longer," indicate this particular intent, yet they do not serve in this case any more than in any of the adjudged cases, where the same expression or terms have been used to overcome the general intent, which is apparent from the additional terms used : "Heirs lawfully begotten forever," which is the basis of the rule in *Shelley's Case.* There may be the particular intent that Robert should take an estate for life ; but the general intent, that his heirs shall take by succession or descent from him, overcomes the particular intent, and givest he fee to him, in order to effectuate the general intent of the testator, that they shall take by descent or succession. *Lyles vs. Diggs*, 6 *H. & J.*, 364 ; *Simpers' Lessee vs. Simpers*, 15 *Md.*, 160.

Take the case of a devise in general terms of a fee to a party, and afterwards the use of words to restrain the alienation of the property—the expression of the particular minor intention does not operate to restrain or overrule the general intention to give the fee. *Smith vs. Clark*, 10 *Md.*, 195.

If terms already employed are sufficiently broad and general to confer or create a fee, the use of additional expressions conferring the power and authority to do what, as owner of the fee the devisee might do, without the gift of the power or authority, should not certainly operate to destroy the fee conferred, if the use of restrictive words, or in restraint of the power of alienation, would not do so.

If it shall be adjudged that Robert D. Williams was the owner of the fee in the "Wm. A. Dick Farm," the liability of that farm to be sold under the order of the Court, to make good the contract, seems to be unquestionable. There is nothing else for it to operate on, and the intention of that contract was to make good to the appellant whatever loss he might suffer by the purchase of the "Wayman Farm" at $3500, by reason of the existence of liens and incumbrances thereon, which loss was to be made good out of whatever estate the said Robt. D. Williams at the time possessed in the " Wm. A. Dick Farm."

*B. H. Harrington* and *A. B. Hagner,* for the appellees.

It is evident from the face of the will that the testator intended that his said son Robert should *take but a life estate,* and the testator's intention is the guide and rule in all cases in the construction of wills, and will be respected always by the Court, unless, as expressed, it contravenes some well established rule of law, and then it is not presumed to express his legal intent.

Does the rule in *Shelley's Case* apply to this will? It is not an unbending rule, its application depending upon the legally expressed intention of the testator, to be collected from the whole will. If the intention of the testator be to create no larger estate in the first devisee than one for life, and that intention *is clearly* derivable from the whole will, such intention must prevail, and the rule will not operate. *Chelton vs. Henderson and Wife,* 9 *Gill,* 432; *Tongue's Lessee vs. Nutwell,* 13 *Md.,* 424; *Shriver and Wife vs. Shriver, et al.,* 43 *Md.,* 400; 4 *Kent Com.,* 225, *marg.; Taylor vs. Watson,* 35 *Md.,* 524; *Johnson vs. Currie,* 10 *Penna.,* 502.

Where there are any superadded explanatory words denoting a different species of heirs, or where the testator annexed words of explanation to the words "heirs," showing thereby that he meant by that word a mere *descriptio*

*personarum* or specific designation of certain individuals; or where the testator superadds words of explanation, or fresh words of limitation, and a new inheritance is grafted upon the heirs to whom he gives the estate—in such cases the words *heirs or the heirs of the body,* will be taken to be words *of purchase* and not *of limitation,* in opposition to the rule in *Shelley's Case*—as where the testator intended the heirs to be the root of a new inheritance or the stock of a new descent; and the denomination of heirs of the body is merely descriptive of the persons who where intended to take. *Doe vs. Laming,* 2 *Burr.,* 1100; *Perrin vs. Blake,* 4 *Burr.,* 2579; *Fulton, et al. vs. Harman, et al.,* 44 *Md.,* 263; 4 *Kent Com.,* 221, *marg.;* 2 *Wash. on Real Prop.,* 274, *marg.; Horne vs. Lyeth,* 4 *H. & J.,* 437.

In the case at bar, the words are, "and *after the death* of my said son, I give and devise the said farms to his heirs, lawfully begotten, forever, to be equally divided between them." These words, "his heirs lawfully begotten," will be taken to mean his *children,* and show that *the estate given to them,* and not *the estates of the son,* were to be the ground-work of succession of heirs; or in other words, that the children of Robt. D. Williams were to be the *termini* from which the succession was to take its course.

Again, the concluding clause of this item of the will—"but should my said son Robert desire to sell the Wayman farm, I hereby authorize and empower him so to do, and also to convey the said land in fee to the purchaser," clearly evinces the understanding of the testator, that the previous words of the devise had only conferred a life estate on his son, and demonstrates his intention in an unmistakable manner. Where a testator gives *a fee* to his devisees, he has *ex vi termini* given the power to sell and convey in fee; and no further words are necessary to confer such a power.

If the testator in this case had supposed he had given the fee in the " Wayman farm " to Robert, by the words in the first part of the devise, he would never have added the latter member of the sentence, giving an express power to sell, since he would have supposed, of course, that the power had already passed by the previous devise. And if he had intended to give the fee by the first words, but still thought it proper to annex the power of sale, why was not the same power expressly annexed to the estate in the Dick land? The Courts are astute to devise a construction that shall declare the failure of issue to mean a definite failure. *Chelton vs. Henderson,* 9 *Gill,* 437; 2 *Redfield on Wills,* 277. The term "lawfully begotten," implies *legitimate heirs,* and therefore not heirs *generally.* 2 *Redf. on Wills,* 12; *Prindle vs. Beveredge,* 7 *Lansing,* 224.

The idea that the words are used *in a technical sense,* will be overthrown by circumstances indicating a contrary intention, to be found in the will. *Fearne on Con. Rem.,* 189–90.

It is not to be presumed that the testator used the words in the first part of the devise as to the " Wayman farm," in a different sense from the same words, when used as to the *Dick* land. And as these words, when construed with the light afforded by the power of sale, must be taken to have given *of themselves,* only a life estate *as to the " Wayman farm,"* the same words, when unaccompanied by any such extension of meaning as to the *Dick* land, must be taken to confer of themselves, only a life estate as to *that* land.

The devise is not to the devisee, " and *if he shall die without issue,"* then over to her. But the will *directly* devises the land after the first taker's death, *to the lawfully begotten* heirs, &c.

But apart from the general principles governing the construction, it is submitted that the case is directly within the Act of 1862, ch. 161. The will was executed and

proved in 1868, and by the provisions of the Act of 1862, the expression *"heirs lawfully begotten," "after the death of my said son,"* must be taken as designating only such heirs as *should be living at the death of the son;* and hence the limitation to the son of the life estate must be sustained. *Goldsborough vs. Martin,* 41 *Md.,* 503.

The contract only covered *the life estate* of Robt. D. Williams in the W. A. Dick farm, and was not *designed* to embrace any greater estate. R. D. Williams having departed this life, it cannot now be enforced against his heirs. Parties entering into contracts must be governed by them as made, according to their true intent and meaning, and must submit to the legal consequences from them. *Boyd vs. Parker, &c.,* 43 *Md.,* 202.

But it matters not what the parties to the contract *intended.* If Robert D. Williams had but a life estate in the Dick land, his agreement to convey a fee could not bind the owners of the fee.

ALVEY, J., delivered the opinion of the Court.

The principal question in this case depends upon the construction of the third clause in the will of William Williams, deceased. The testator left three sons, to each of whom he devised land; and the devise to his son Robert D. Williams, being the third clause in the will, is as follows: "I give and bequeath unto my son, Robert D. Williams, the farm I purchased of Wm. A. Dick, containing one hundred and fifty acres, more or less, and also the farm where Charles Wayman now lives, containing 202 acres, more or less, during the term of his natural life, *and no longer,* and after the death of my said son, I give and devise the said farm to *his heirs lawfully begotten,* forever, to be equally divided between them; but should my said son, Robert, desire to sell the farm whereon Charles Wayman now resides, I hereby authorize and empower him so to do, and also to convey the said land in fee to the purchaser or purchasers."

The devises made to the other two sons, William A. Williams and John B. Williams, by the first and second clauses of the will, are in substantially the same terms as those employed in the devise to Robert D., omitting only the express power of sale appended to the third clause. There is also a residuary clause in the will, whereby all the rest and residue of the testator's estate is given to his three sons, to be equally divided between them.

The question is, whether the estate taken by Robert D. Williams, the son, was one for life only, or one in tail general, converted by the statute into a fee simple.

It would seem to be clear on authority, that a devise to a party and his heirs *lawfully begotten* confers only an estate tail; the word *heirs*, in such case, being construed heirs of the body. *Co. Litt.*, 20*b, and n.* 2 ; *Good vs. Good*, 7 *El. & Bl.*, 295 ; *Pratt vs. Flamer*, 5 *H. & J.*, 10. Hence we may read the devise in this case as being to the first devisee for life, and no longer, and after his death to the heirs of his body lawfully begotten.

But it is insisted by the appellees that the word *heirs*, as used in this devise, should be taken to mean children, and instead of being a word of limitation, it should be taken as a word of purchase. And upon this construction, the result would be, that the son, the first devisee, would take but a life estate, with remainder to the children as purchasers. For this construction, reliance is placed upon what is supposed to be the apparent intent of the testator ; and as evidence of that intent, the negative or restrictive words used in connection with the devise of the estate for life, and the subsequent words of division, used in connection with the devise to the heirs, followed by the power of sale to the first devisee, are urged as making the matter plain and incontrovertible. But, in our view of the case, these indications of design do not remove all the difficulties out of the way of the construction contended for by the appellees.

It is a well settled rule of construction, that technical words of limitation used in a devise, such as *heirs* generally, or *heirs of the body*, shall be allowed their legal effect, unless from subsequent *inconsistent* words it is made perfectly plain that the testator meant otherwise. Or, to use the language of Lord ELDON, in *Wright vs. Jesson, 2 Bligh*, 1, the words *heirs of the body* will indeed yield to a particular intent that the estate shall be only for life, and that may be from the effect of superadded words, or any expression showing the particular intent of the testator, *but that must be clearly intelligible and unequivocal.*

This principle is very clearly stated and adopted by this Court, in the case of *Simpers vs. Simpers*, 15 *Md.*, 160, 187. It results from the great necessity, always acknowledged by the Courts, of adhering to established rules of construction, in order to maintain certainty and stability of titles.

It may be assumed as certain, that the testator intended, by the devise of the remainder to the son's heirs lawfully begotten, that the son's descendants, or posterity should take the estate ; and that, too, without restriction to the son's children that might be living either at the death of the testator or the devisee for life. This being so, the question is, by what principle does the law provide for executing that intent? A general rule of construction must be invoked, and that rule is, if an estate of freehold be devised to a man, and either mediately or immediately, an estate is limited to the heirs of his body, he will take an estate tail. If all embraced within the description of heirs or heirs of the body of the first taker are designed to take, giving to those words their legal and technical meaning, then the only mode of effecting that general intent is by the application of the general rule just stated. All taking in the character of heirs, in such case, must take by descent from the first taker. This is the operation of the rule in *Shelley's Case*, which has been for ages an

established rule of property. *Jones vs. Morgan*, 1 *Bro. C. C.*, 206; *Simpers vs. Simpers*, 15 *Md.*, 187. And the question here is, whether the force of this rule is fairly overcome by the circumstances indicative of a particular intent, relied on by the appellees.

It has been settled by numerous decisions, that a devise to one for his *natural* life, or for his life *only*, with remainder to his heirs, will not restrict the first devise to a life estate. And in the case of *Robinson vs. Robinson*, 1 *Burr.*, 38, the devise was of " all my real estate, &c. to H. for and during the term of his natural life, *and no longer*," provided he take the name of the testator, and live at the house, &c.; " and after his decease, to such son as he shall have, lawfully to be begotten, &c.; and for default of such *issue*," then over. That devise was, upon most thorough consideration, determined, first in the King's Bench, then in Chancery, and finally in the House of Lords, to pass an estate tail to H., the first devisee. And the decision proceeded upon the ground, that it was necessary that H. should take an estate tail, in order to effectuate the manifest *general intent*, notwithstanding the express estate devised to H. for his life and no longer. See, also, the case of *Thong vs. Bedford*, 1 *Bro. C. C.*, 313, and note thereto by Eden. Indeed, it is text-book law, that no expressions negativing the continuance of the devisee's estate beyond the period of his life, however express or unequivocal, when not combined with other indications of intent, will be sufficient to exclude the rule ; for the intent to give but a life estate is as clearly evinced by the mere limitation of a life estate as by any additional expressions. 2 *Pow. Dev.*, 433; 2 *Jarm. Wills*, (*Ed. of* 1855,) 246. And it is equally clear that the terms *to be equally divided between them*, have no such effect as to restrain the operation of the words *heirs of the body*, and convert them into words of purchase. 2 *Pow. Dev.*, 464; 2 *Jarm. Wills*, 277. In the leading English case of *Wright vs. Jesson*, in

the House of Lords, reported in 2 *Bligh*, 1, where the whole subject was most thoroughly discussed and considered, the devise was to W. for the term of his natural life, he keeping the buildings in repair; and from and after the death of W. to the heirs of the body of the said W. lawfully issuing, in such shares and proportions as he, the said W. by deed or will, should appoint, and for want of such appointment, *then to the heirs of the body of the said W. lawfully issuing, share and share alike as tenants in common,* and if but one child, the whole to such only child; and for want of *such* issue, then over. That devise was held to confer upon W. an estate tail; and the reasoning upon which the judgment was based, proceeded upon the familiar doctrine, that where there is a particular and a general or paramount intent, the latter must prevail, and Courts are bound to give effect to it. There the general intent was, that all the descendants of W., to the remotest generation, should take before the devise over became operative; and the apparent particular intent was, that W. should take but a life estate; and in order to effectuate the general intent, it was held, that the remainder limited to the heirs of the body became immediately executed in W., and that he thereby took an estate of inheritance. So in this case; and, according to our law, though different in England, the direction that the estate should be equally divided among those taking as heirs, is not inconsistent with or repugnant to the descent from the first taker to his heirs as such.

It is quite clear then, if there was nothing more than the negative or restrictive words connected with the gift for life, and the direction that the estate, when it devolved on those in remainder, should be equally divided among them, an estate of inheritance would be executed in the first devisee.

It is urged, however, that the power of sale expressly given the son as to part of the estate devised, is strongly

indicative of the testator's intention to give but a life estate to the son. But the most that can be said of such power is, that it may be regarded as some evidence of the testator's construction of his own words used in the previous devise. There is nothing conclusive in regard to it; and, as will be observed, there is no direction as to the proceeds of sale. If we take the power of sale appended to the third clause of the will as evidence of what the testator understood to be the effect of the devise to his son Robert, that evidence equally applies to the two preceding devises to his sons William and John. But, upon authority, the giving of such power after the devise, can have no such controlling influence as is claimed for it. It has been decided in numerous cases, that the interposition of an estate to preserve contingent remainders, between the estate for life and the limitation to the heirs of the body, or a declaration that the first taker shall have power of jointuring, or that the estate shall be without impeachment of waste, will not vary the legal import of the technical words, or prevent the remainder to the heirs from becoming an executed estate in the ancestor. 2 *Pow. Dev.*, 434; 2 *Jarm. Wills,* 246; *Poole vs. Poole,* 3 *Bos. & Pul.*, 620, 627. Such provisions of the will are as strongly confirmatory of the intention to give the first taker but a life estate, as the power of sale can be; for all such powers and provisions are nugatory, upon the supposition that the first taker acquires an estate of inheritance.

We must therefore conclude, that none of the circumstances relied on, considered either separately or all combined, sufficiently indicate a plain and unequivocal intention of the testator, to use the words *heirs lawfully begotten* in the sense of children, rather than in their strict technical sense. Those words are of strict legal import, denoting in themselves the nature and character of the estate devised; and they have less flexibility than the word *issue*, which has frequently, upon the context of the will, and

in deference to a plain intent, been construed as synonymous with children. *Horne vs. Lyeth*, 4 *H. & J.*, 439 ; *Chelton vs. Henderson*, 9 *Gill*, 432.

Having concluded that Robert D. Williams took an estate tail general under the devise to him, that estate, by operation of the statute to direct descents, is converted into a fee simple estate, and, as such, is liable to the debts of the devisee. *Newton vs. Griffith*, 1 *H. & G.*, 111 ; *Wells vs. Beall*, 2 *Gill & John.*, 458.

The next question is, whether the contract of the 27th of May, 1873, between the appellant and Robert D. Williams, can be specifically enforced ? Robert D. Williams is dead, and at the time of his death he was largely indebted by judgment and otherwise, according to the allegations of the bill, the truth of which is admitted by the demurrer. By the contract, Robert D. Williams obligated himself to relieve the farm sold to the appellant of all liens created by his debts, and to fix and charge such liens exclusively upon the Dick farm, retained by him. In the present attitude of the case, with nothing disclosed except the matters charged in the bill, and the contract as an exhibit, we can perceive no good reason why the contract should not be specifically enforced against the land that was agreed to be charged to the exoneration of the land sold to the appellant.

We shall therefore reverse the *pro forma* decree of the Court below, sustaining the demurrer and dismissing the bill, and shall remand the cause for further proceedings.

*Decree reversed, and*
*cause remanded.*

(Decided 26th June, 1878.)